**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Harold Leroy BARNETT, Appellant.**

Superior Court of Pennsylvania.

Submitted April 16, 2012.

Filed July 31, 2012.

John J. Fioravanti, Jr., Doylestown, for appellant.

David W. Heckler, Assistant District Attorney and Michael K. Martin, Assistant District Attorney, Doylestown, for Commonwealth, appellee.

BEFORE: BENDER, J., LAZARUS, J., and STRASSBURGER, J.*

OPINION BY BENDER, J.

Appellant, Harold Leroy Barnett, appeals from the judgment of sentence of 25–50 years' incarceration imposed following his conviction for various sexual offenses committed against two minors. After careful review, we affirm.

Appellant was tried by a jury over the course of four days in December of 2010. The trial court summarized the sum and substance of the facts adduced at trial as follows:

Just after Thanksgiving, in November of 2009, [A.M.] entered the bathroom while her twelve-year-old daughter B.M. was taking a shower. B.M. opened the shower door and asked her mother if she looked pregnant. When [A.M.] asked B.M. why she would ask such a thing, B.M. informed her mother that Appellant, "Uncle Roy" as she referred to him, "had been rubbing his thingy on her vagina." As she described this to her mother, B.M. motioned with her hand, waving it around her groin area. That night, after B.M. went to bed, [A.M.] looked through B.M.'s belongings and found a used pregnancy test.

B.M. first met Appellant in approximately 2006, when her mother, [A.M.], began dating [B.W.] Appellant is [B.W.]'s uncle. B.M. stated that Appellant first started engaging in inappropriate behavior towards her in 2007, around the time that her mother graduated from art school. Following graduation, [A.M.] and [B.W.] took a vacation to the Dominican Republic, and Appellant and his wife, Donna Barnett, watched B.M. while they were away. Beginning on this occasion and continuing for several years, Appellant engaged in inappropriate behavior. B.M. would often spend time at Appellant's house after school, sometimes on her own, and on most occasions, when her cousins M.W. and Mikey were also there. M.W. and Mikey are the children of Appellant's nephew. . . .

B.M. reported instances where Appellant would pull down his pants and start rubbing his penis against her vagina. After this happened, B.M. would go into the bathroom and "wipe the creamy stuff off." These instances occurred in Appellant's living room, bedroom and basement. Appellant created games so

---

* Retired Senior Judge assigned to the Superior Court.

that he could engage in this behavior, including one where B.M. would have a football and try running across the room to make a "touchdown." If Appellant caught her, however, she would have to lie down and Appellant would rub his penis on her vagina. On one occasion, while B.M. was using the telephone in Appellant's living room to talk to her friends, Appellant approached her, "pulled down [her] pants and started licking [her] vagina." Appellant often took B.M., M.W. and Mikey to swim in his neighbor's pool. During one of these outings, while M.W. and Mikey were swimming in the shallow end, Appellant brought B.M. into the deep end, removed her bathing suit and, again, began rubbing his penis against her vagina. The abuse did not end until several days before B.M. reported it to [A.M.]

When B.M. reported this sexual abuse to her mother, [A.M.] immediately contacted [J.W.], M.W. and Mikey's mother. After she received the phone call, [J.W.] approached M.W. M.W. informed her mother that Appellant had rubbed his penis against her butt.[5] Specifically, M.W. related two instances where Appellant, his wife, Donna Barnett, Mikey and M.W. were all sleeping in Appellant's bed. The first instance occurred during the summer of 2009, and the second during Thanksgiving weekend of 2009. On both occasions, M.W. woke up to Appellant touching her butt.

---

5 Initially, [J.W.] asked M.W. if Appellant had "touched her privates," and M.W. said no. When asked "if there was anything he did that . . . she knew was wrong," M.W. said yes.

[A.M.] and [J.W.] reported this sexual abuse to the Bensalem Township Police Department in early December of 2009. On December 4, 2009, B.M. was interviewed by Detective Kevin Cornish of the Bensalem Township Police De-

partment[.] M.W. was interviewed on December 7, 2009. Appellant was arrested and a criminal complaint was filed on December 7, 2009.

Trial Court Opinion (T.C.O.), 9/15/11, at 6–8.

On December 6, 2010, Appellant was convicted of unlawful contact with a minor, 18 Pa.C.S. § 6318(a)(1), indecent assault, 18 Pa.C.S. § 3126(a)(7), and corruption of minors, 18 Pa.C.S. § 6301(a)(1) for the sexual abuse of B.M. Appellant was also convicted of unlawful contact with a minor, indecent assault, and corruption of minors for the sexual abuse of M.W. Though also charged with rape and aggravated indecent assault of B.M., Appellant was acquitted of those offenses.

Sentencing was deferred until January 27, 2011. The Commonwealth waived a sexual offender assessment pursuant to Pennsylvania's Megan's Law, and stipulated that Appellant shall not be classified as a Sexually Violent Predator. T.C.O., at 2. Appellant was then sentenced to a term of 25–50 years' incarceration pursuant to the mandatory sentencing provisions of 42 Pa.C.S. § 9718.2 (Sentences for Sex Offenders).

Appellant now presents the following issues on appeal:

A. Did the Trial Court err in admitting out-of-court statements of the ten-year-old and twelve-year-old sexual assault complainants under the Tender Years Act, 42 Pa.C.S. § 5985.1 where the time, content and circumstances of the statements did not provide sufficient indicia of reliability and the statements given to the Bensalem Detective were testimony?

B. Did the Trial Court err in permitting the District Attorney to present the testimony of Doctor Robert

Charles in rebuttal, as his testimony did not contradict the testimony of Doctor Steven Orland, an expert presented by the defense?

C. Did the Trial Court err in permitting the handwritten statement of B.M. (journal entry)(C–2) to go out with the jury during the deliberations?

D. Did the Trial Court err in failing to declare 42 Pa.C.S. § 9718.2 unconstitutional in violation of the Cruel and Unusual Punishment Clauses of the Federal and State Constitutions?

Appellant's Brief, at 4. We will address each issue in the order in which it was presented.

Appellant's first claim asserts that the trial court erred in permitting the victims' out-of-court statements to be entered into evidence through the hearsay testimony of A.M., J.W., and Detective Kevin Cornish (hereinafter "Detective Cornish" or "Cornish") pursuant to the hearsay exception provided by the Tender Years Statute because Appellant claims there was not sufficient indicia of reliability to meet the requirements of 42 Pa.C.S. § 5985.1(a)(1).

■ "Generally, the admissibility of evidence is a matter of trial court discretion and a ruling thereon will only be reversed upon a showing that the trial court abused that discretion." *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 775 (2004). An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Commonwealth v.*

*Brougher*, 978 A.2d 373, 376 (Pa.Super.2009).

■ Hearsay[1] is generally inadmissible at trial unless it falls into an exception to the hearsay rule. Pa.R.E. 802. "[T]he Tender Years Statute creates an exception to the hearsay rule in recognition of the fragile nature of the victims of childhood sexual abuse." *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 988 (Pa.Super.2007) (citing *Commonwealth v. Curley*, 910 A.2d 692 (Pa.Super.2006)).

The Tender Years Statute provides an exception to the hearsay rule, in pertinent part, as follows:

(a) **General rule.**—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25 (relating to criminal homicide), 27 (relating to assault), 29 (relating to kidnapping), 31 (relating to sexual offenses), 35 (relating to burglary and other criminal intrusion) and 37 (relating to robbery), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

42 Pa.C.S. § 5985.1.

Regarding 42 Pa.C.S. § 5985.1(a)(1), this Court has previously stated that "[i]ndicia of reliability include: 'the spontaneity of

---

1. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801 ("Definitions").

the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age and the lack of a motive to fabricate.'" *Commonwealth v. Kriner*, 915 A.2d 653, 657 n. 3 (Pa.Super.2007) (quoting *Commonwealth v. Delbridge*, 578 Pa. 641, 855 A.2d 27, 46 (2003)).

With respect to B.M.'s statement, Appellant contends that indicia of reliability was lacking because B.M. "waited five years to disclose any of this to an adult." Appellant's Brief, at 12. Appellant argues that since B.M. spent numerous weekends with Appellant from 2004 until 2009, she had "countless occasions to report these crimes when she was alone with her mother." *Id.* at 13. Appellant suggests B.M. had a motive to fabricate because, in the weeks preceding B.M.'s statement, her mother "explained sexual conduct, pregnancy[,] and peer pressure to B.M. Shortly after this discussion, the statement surfaced." *Id.* Furthermore, Appellant argues, "[A.M.] waited one week to go to the police, after speaking with Appellant's wife and receiving no response." *Id.* And finally, Appellant points to the fact that B.M. told Detective Cornish that "she learned about sex in health class at school and not from her mother." *Id.*

With respect to the statement made by M.W. admitted through the Tender Years Statute, Appellant contends that her statement lacked indicia of reliability because "M.W. did not come forward with the allegations, but instead, was confronted by her mother after [J.W.] learned of B.M.'s experience. Initially, the child denied any sexual abuse." *Id.*

Finally, Appellant challenges the statements given by B.M. and M.W. to Detective Cornish. Appellant asserts that the statements were testimonial in nature and not given in response to an emergency. *Id.* at 13–14. Appellant claims that the pri-

mary purpose of the statements given to Detective Cornish were "to establish or prove past events potentially relevant to the later criminal prosecution[,]" noting that "Appellant was arrested shortly thereafter ... [and the children] were old enough to understand the purpose of the meeting." *Id.* at 14.

The trial court conducted a pretrial hearing on December 1, 2010 to determine the admissibility of the girls' statements to A.M., J.W., and Cornish. N.T., 12/1/10, at 22–93. During cross-examination, A.M. indicated the content of the "sex talk" she had with B.M. a week or two prior to the revelation of the allegations against Appellant. She said that she told B.M. that sex was "penetration of the penis into the vagina" and that it was "supposed to be when you're in love and special and not for when you're young; and that don't follow what you see on TV or what your friends might want to do." *Id.* at 34. A.M. also said that she was prompted to give the talk when she noticed B.M. beginning to watch "more mature" TV shows, and because A.M. had it in the back of her mind since she had been trying to get pregnant from her fiancé. *Id.*

A.M. testified that B.M. did not use technical language when describing what happened with Appellant. She indicated that B.M. used the word "thingie" to describe Appellant's penis, telling her that Appellant "rubbed his thingie on me." *Id.* at 39. B.M. didn't use the word "vagina" either, but instead she "just pointed and showed [A.M.] how he did it, like this, on her vagina." *Id.* When referring to Appellant's ejaculating, B.M. "said white stuff came out." *Id.*

A.M. indicated that she waited a week to inform police because it was her intent "to take [B.M.] to see a psychologist" and because A.M. "didn't want to believe it...." *Id.* at 35. She also took that time

to talk to family members, including Appellant's wife and J.W., "just to see if this has happened before or if they knew anything." *Id.* at 35–36. Ultimately, however, she did not take B.M. to a psychologist. *Id.* at 36.

Though A.M. tried to contact her, Appellant's wife did not call A.M. back. *Id.* at 38. A.M. explained:

> Well, my fiancé, given that [Appellant] has really been a good person to us and fixed our house and he was around all the time, he said maybe it's not true. And we just decided to like see what happened in terms of [Appellant's wife] calling me back, because she didn't want to talk to me or [A.M.'s fiancé]. I didn't want to make a hasty move. I really didn't want to do that without all the facts.

*Id.* When Appellant and his wife failed to return A.M.'s calls or otherwise make some attempt to contact her, A.M. decided to take B.M. to talk to the police. *Id.*

J.W. testified that immediately after receiving a call from A.M., she asked M.W. if Appellant had ever touched her, and M.W. said that he did. *Id.* at 45. M.W. told J.W. that over Thanksgiving weekend, Appellant "was rubbing his privates against her butt." *Id.* M.W. also told J.W. that it had happened once before, during the summer prior to Thanksgiving. *Id.* at 46. During the summer occurrence, M.W. was sleeping in a bed with her brother, Appellant's wife, and Appellant when she was woken up by Appellant "rubbing his privates against her buttocks." *Id.* J.W. testified that while asking M.W. about these incidences, M.W. was feeling uncomfortable and awkward. *Id.* at 47.

On cross-examination, J.W. admitted that initially, M.W. denied that anything had happened with Appellant. *Id.* at 49.

J.W. explained that her first question was whether Appellant had touched her privates, to which she answered, "no." *Id.* When asked if Appellant had made her feel uncomfortable, or if he had done something M.W. knew was wrong, M.W. told J.W. about Appellant rubbing against her. *Id.* J.W. did not recall if she had ever asked M.W. if she had spoken with B.M. about the molestation. *Id.* at 50.

Detective Cornish also testified at the hearing. Cornish was assigned to the Special Victim's Unit at Bensalem, which dealt with "child sexual assault, child physical abuse, adult sexual assaults, crimes against the elderly, child exploitation, investigation of child pornography[,] and domestic violence cases." *Id.* at 51–52. Cornish, trained as a forensic interviewer of children, had conducted hundreds of such interviews. *Id.* at 52–53. The interview structure involved a pre-interview meeting with "an assistant district attorney, [a] Nova[2] representative, [a] Children and Youth ... case worker[,] and law enforcement." *Id.* at 54. The interview was administered only by the interviewer, and "on the other side of the two-way mirror, listening through the audio system, is law enforcement or the Children and Youth worker and the district attorney." *Id.* This process is conducted so that a child is not subjected to multiple interviews by Children and Youth services, law enforcement, and district attorneys. *Id.* at 55–56.

At the interview with B.M., Cornish established ground rules for the interview and asked several questions to garner an understanding of B.M.'s competency. *Id.* at 59–61. B.M. was then asked, "[d]o you know why you were brought here today?" *Id.* at 61. B.M. answered, "[b]ecause [Appellant] is sexually harassing me." *Id.* She

---

**2.** A victim's advocate organization.

said she learned that terminology in school. *Id.*

Cornish asked B.M. to tell him more about [Appellant] sexually harassing her. *Id.* at 62. She first said that when she and Appellant were in a pool at Appellant's neighbor's house, Appellant "touched her boobs, indicating her chest area, while they were swimming inside the pool. And she said he was removing her top or bathing suit in various stages." *Id.* She said her cousins were there, including M.W., but she was not sure if they saw. She also indicated that he "push[ed] up against her inside the pool." *Id.*

B.M. also described a game called "Catch [B.M.]" *Id.* at 63. B.M. told Cornish that she and Appellant would chase each other, and if she was caught or tagged, "she has to lie down on the ground. At that time he pulls down her pants, removing her pants and underwear, and rubs his penis up against her vagina."[3] *Id.* She also told Cornish that she would be locked in a room if she refused to play "Catch [B.M.]" with Appellant. *Id.* at 66.

B.M. said that after Appellant rubbed his penis on the outside of her vagina, "white sticky stuff would come out." *Id.* at 63. She would then get up and go wash it off in the bathroom. *Id.* at 64. She indicated to Cornish that this happened on more than one occasion. *Id.* She said that on another occasion Appellant tried to put his penis inside her vagina, but that it hurt, and so she kicked Appellant off of her. *Id.* On another occasion, while in the presence of M.W. and her brother, Appellant tried to rub his penis against her vagina, but B.M. told him, "[n]ot here, the kids are here. . . ." *Id.*

B.M. told Cornish that the first time she could remember something happening with Appellant was when her mother went on vacation in the summer of 2007. *Id.* at 65. She said that there were more than ten incidences of improper contact, and the last time occurring about a month before the interview. *Id.* She also indicated evidence of "grooming" behavior—specifically, that Appellant would reward her for complicity in the sexual acts. *Id.* at 67. When asked if Appellant "buys her anything[,]" B.M. responded that Appellant "buys her anything [she] want[s]." *Id.* Cornish also asked B.M. about the pregnancy test. B.M. told Cornish that "she learned about it in health class. She knew that the white sticky stuff [Appellant] had been leaving on the outside of her stomach or vagina might cause her to become pregnant." *Id.* at 69.

Cornish interviewed M.W. and subjected her to the same initial line of questioning to establish competency. *Id.* at 69–70. Cornish then stated that she was there to speak with him "because someone may have hurt her." *Id.* at 71. M.W. responded, "oh, yeah, [Appellant]." *Id.* She then told Cornish that:

> she had slept over [Appellant]'s house. She had been asleep in the bed . . . next to [Appellant]. . . . She stated while she was sleeping she was laying on her side. [Appellant] was pressing up against her, touching her butt with his hand and then rubbing his privates on her butt.

*Id.* She said that this occurred during the summer of 2009 and again around Thanksgiving of the same year. *Id.* at 72. M.W. told Cornish that Appellant "would rub up against her for a few minutes. She would lay on her side. Her impression was he thought she was asleep. And I asked her

---

**3.** Cornish used an anatomical drawing to ensure that there was an understanding of the words being used, however, he indicated that

B.M. used the terms 'vagina' and 'penis' on her own. *Id.*

how it stopped or why it stopped. She said she would just wiggle away." *Id.* When asked what she meant by "privates," she used the anatomical drawing to indicate she meant Appellant's penis. *Id.* at 72–73.

Soon after the interview, a criminal complaint was filed and Appellant was arrested by Detective Cornish. When Appellant was placed in custody, Cornish asked him if he knew why the police were there. Appellant responded, "child molestation." *Id.* at 74. When Cornish ran a criminal background check on Appellant, he found that Appellant had been arrested in 1978 for "forcible child rape and incest." *Id.* at 76. In 1979, Appellant was convicted of incest. *Id.* The victim had been Appellant's daughter, and she was 13 at the time the allegation was made. *Id.*

Following the testimony of the three witnesses, the trial court heard argument from counsel regarding the admission of the statements. The Commonwealth began by discussing the statement made by B.M. to A.M. The Commonwealth argued that the statement was clearly spontaneous, because B.M. had initiated the conversation by asking her mother if she looked pregnant. *Id.* at 84. The Commonwealth also suggested that the similarities between B.M.'s statements to A.M. and Detective Cornish provided additional indicia of reliability. *Id.* at 85. Furthermore, the Commonwealth argued, the language used by B.M. was on par with her age (using terminology like "white sticky stuff"), and yet the subject matter was clearly suggestive of sexual abuse. *Id.* at 85. The Commonwealth also pointed out that there was no evidence of motive to fabricate, and that there were no issues regarding B.M.'s mental state at stake. *Id.* at 85–86.

Regarding M.W.'s statement to J.W., the Commonwealth argued that the specificity of M.W.'s answers to her mother's inquiry suggest reliability. *Id.* at 86. M.W. did initially deny having her 'private area' touched, but she did react to the question of whether Appellant did anything to make her feel uncomfortable or that she knew was wrong, at which time she indicated that Appellant had rubbed himself on her buttocks. *Id.* The Commonwealth argued that her language was consistent with her age, and that there was nothing to indicate a motive to fabricate. *Id.*

Regarding the girls' statements to Detective Cornish, the Commonwealth argued that the questions asked of the girls were open-ended and non-suggestive. The Commonwealth also argues that the fact the statements were made to Cornish, one-on-one, and outside the presence of their mothers, added to their reliability. *Id.* at 87. The Commonwealth noted that the terminology used by the girls remained consistent with the prior statements and consistent with their age. *Id.* The Commonwealth further argued that, with respect to all the statements, Appellant's prior conviction and his remarks to police when he was arrested all provided additional indicia of reliability for the statements. *Id.* The Commonwealth also told the Court that the victims and Detective Cornish would all be presented as witnesses, and thus they would be subject to cross-examination by Appellant's attorney. *Id.* at 87–88.

The entirety of Appellant's trial attorney's argument was as follows: "I object to [the statements'] admission. I don't believe that the Commonwealth has established the necessary standards." *Id.* at 88.

The trial court then determined that it would allow the admission of each of the statements under the Tender Years Statute, and the court included a lengthy statement on the record summarizing its factual findings and the factors it found determi-

native in concluding that each statement contained sufficient indicia of reliability to permit admission under the Tender Years Statute. *Id.* at 88–93. To summarize, the trial court found that A.M., J.W., and Cornish were each credible witnesses. *Id.* The court found that the statements made to A.M., J.W., and Cornish were "clearly relevant." *Id.* at 91. The court found that the statements were timely and content appropriate, and furthermore that there was no evidence that any of the statements had been coerced, and that there was no evidence of any motive on the part of either girl to fabricate. *Id.*

The court found that the statements were consistent between their conveyance to the girls' mothers and then to Detective Cornish, adding to their reliability. *Id.* at 91–92. The trial court found that the terminology used by B.M. when talking to A.M. was "common language that a child of that age would use[,]" and not "the kind of language that would be used if someone was prompted to give that information." *Id.* at 91—92. The court also stated that though J.W. had some knowledge beforehand when she approached M.W., "she did not coerce or prompt her in any way, place words in her daughter's mouth, and that the statement of rubbing his privates against her butt [was] consistent both from what J.W. heard and then what Detective Cornish heard." *Id.* at 92.

The court found that the statements to Cornish were consistent with the girls' prior statements to A.M. and J.W., that Cornish's protocol for obtaining statements established that there was a "minimal chance of tainting the children in any away in obtaining their statements ..." and, thus,

the statements to Cornish were also reliable. *Id.* at 92. The court also stated that it took "into consideration as one factor but of minimal value the fact the defendant had previously been convicted of a sexual offense against a young person." *Id.* at 92–93. In concluding, the trial court stated that it found M.W.'s and B.M.'s statements "reliable based upon all the circumstances presented ..." and determined that they would be admissible both as substantive evidence under the Tender Years Statute, but also for the purpose of bolstering the victims' testimony as prior consistent statements. *Id.* at 93. In its Opinion, the trial court relied heavily upon the reasoning set forth at the hearing in concluding that Appellant's claim that the statements were inadmissible under the Tender Years Statute lacked merit. T.C.O., at 11.

We conclude that the trial court did not abuse its discretion in admitting each of the statements pursuant to the Tender Years Statute. There was more than a sufficient showing of indicia of reliability with respect to each statement.

■ The initial statement by B.M. to A.M. was spontaneous and internally consistent (and remained so when retold to Detective Cornish). Its reliability was bolstered by B.M.'s contemporaneous attempts to test herself for pregnancy, the fact that the language she used was consistent with her age, and because there was no evidence of a motive to fabricate, nor was there direct evidence of fabrication. Appellant's prior record and his statement to police upon being arrested are also consistent with the statement's reliability.[4]

4. We conclude, as did the trial court, that Appellant's prior conviction was relevant evidence but evidence of limited value, and could be considered in the context of the totality of the circumstances in this case but

was not by itself dispositive as to the matter of reliability. The statement made contemporaneously with arrest was relevant, but of even lesser value, particularly because the record demonstrates that Appellant and Appellant's

Appellant's claim that B.M.'s statement was prompted by A.M.'s recent "sex talk" may indeed be true, but Appellant has failed to develop any argument regarding why that fact would undermine the statement's reliability.[5] Furthermore, Appellant's contention that B.M.'s statement was unreliable because she later told Detective Cornish that "she learned about sex in health class at school and not from her mother" is also without merit, as the argument itself is not a fair representation of the factual record. Cornish testified that B.M. told him that she learned about sex in health class. *Id.* at 79. When questioned, Cornish said that B.M. did not tell him about the "sex talk" she had with A.M. *Id.* The fact that B.M. learned about sex from her mother, and that she learned about sex in health class, are not mutually exclusive possibilities as Appellant's argument would suggest. The inference of fabrication from such a minor inconsistency (if it is an inconsistency at all), simply does not outweigh the ample indicia of reliability in this case.

 With regard to M.W.'s statement to her mother, J.W., we note that the statement did occur under different circumstances, since J.W. initiated the conversation with her daughter, and already knew of the allegation being made by B.M. However, there was no evidence that M.W. knew of B.M.'s allegation, and there is no evidence that J.W. engaged in any suggestive form of questioning that would call into doubt the veracity of M.W.'s state-

ment. J.W.'s inquiry was open-ended. Furthermore, M.W.'s statement used language appropriate for her age, and it did not contain language that would give rise to a suspicion that the accusation had been manufactured. And, as was the case with B.M.'s statement, there was no evidence of a motive to fabricate, and no evidence of fabrication. Furthermore, M.W.'s statement was consistent with her later statements to Cornish. The reliability of M.W.'s statement was also supported, to a limited extent, by evidence of Appellant's prior conviction.

M.W.'s initial denial does not raise serious concern about her statement's reliability. M.W. appeared to be responding candidly to the particular language of the question rather than changing her story, and thus her initial denial to the question of whether Appellant touched her privates does not necessarily contradict her answer to the question of whether Appellant did something M.W. knew was wrong or made her uncomfortable. Her statement remained consistent and did not appear embellished, coerced, or fabricated.

 The statements the girls made to Detective Cornish were almost identical to the statements they gave their mothers. There was no evidence of embellishment from the prior statements and, furthermore, the questions Cornish presented to the girls were open-ended and not remotely suggestive. As was the case with the earlier statements, there was no evidence

---

wife were contacted by A.M. regarding the accusations of child molestation in the week preceding the arrest. We do not find either or both of these factors necessary to our conclusions regarding the reliability of the statements.

5. While the "sex talk" may have prompted B.M.'s pregnancy worries, it does not explain how or why she believed that she had been

sexually assaulted—A.M.'s testimony did not indicate that she had ever breached the subject of sexual abuse when she had the "sex talk" with B.M. Appellant would have us believe that the mere act of explaining the "birds and the bees" to a preteen child increases the risk of false accusations of child molestation. We reject such an inference as bordering on absurdity.

to suggest motive to fabricate or actual fabrication.

■ Accordingly, we conclude that there were sufficient indicia or reliability with respect to each of the above statements to permit their admission under the Tender Years Statute, 42 Pa.C.S. § 5985.1. Therefore, we conclude that the trial court did not abuse its discretion in admitting the statements pursuant to that exception of the hearsay rule.[6]

Appellant's second claim posits that the trial court abused its discretion by permitting the Commonwealth's expert urologist to testify. Appellant presented the testimony of Dr. Steven Orland ("Dr. Orland") in order to establish that Appellant was unable to achieve an erection adequate for sexual activity to dispute the claim that he penetrated B.M. Appellant contends that the rebuttal testimony given by the Commonwealth's expert, Dr. Robert Charles ("Dr. Charles"), was improperly admitted because it did not, in fact, rebut Appellant's expert testimony.

Dr. Orland testified to his conclusion, to a reasonable degree of medical certainty, that "starting at the time [Dr. Orland] began seeing [Appellant] and even by history going back at least a year or more, [Appellant] was unable to achieve an erection that would be hard enough and firm enough for sexual activity." N.T., 12/3/10, at 67. Dr. Orland also testified that the results of testing on Appellant indicated that Appellant did not suffer from a neurologically based erectile dysfunction, but rather he was affected by a more common blood flow issue. *Id.* at 65, 73. During cross-examination, Dr. Orland admitted that Appellant's erectile dysfunction would not prevent his penis from making contact with the labia, but it would prevent actual penetration of the vagina. *Id.* at 68, 74.

Dr. Charles was called by the Commonwealth in rebuttal. Dr. Charles first addressed the opinion given by Dr. Orland:

Q. Dr. Orland testified the defendant could not achieve an erection suitable for sexual activity. You reviewed his opinion on that?

A. Yes.

Q. Do you agree with that?

A. I have a problem with the term sexual activity. It's a very vague and very broad term. As you stated when you cross-examined him, I believe he was referring to sexual intercourse, that the patient was unable to complete sexual intercourse. From reading through the record, it sounds like that is correct.

*Id.* at 140.

Dr. Charles further testified that in reviewing Appellant's record, he could find nothing that would indicate that Appellant "could not penetrate or touch the outer portion of the vagina or place his penis into the outer portion of the vagina." *Id.* at 141. He also explained that: "the mechanism of erection is different than the mechanism of ejaculation ... [and, thus, e]ven patients with complete erectile dysfunction are still, with manual stimulation,

6. We additionally note that both B.M. and M.W. testified at Appellant's trial and, thus, they were available for cross-examination. Appellant's assertion that any of these statements present a Confrontation Clause concern is, therefore, wholly without merit, as Appellant was clearly afforded the opportunity to confront his accusers in court. It is axiomatic that the Confrontation Clause does not apply where the out-of-court speaker is available for cross-examination in court. Nonetheless, Appellant's Confrontation Clause claim was not raised in his statement of errors complained of on appeal and, therefore, we conclude such claims have been waived. *See Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (1998) ("Any issues not raised in a 1925(b) statement will be deemed waived.").

able to ejaculate." *Id.* Dr. Charles then concluded that based upon this fact, and after a review of Appellant's medical documents and the testimony of Dr. Orland, there was nothing to indicate that Appellant was incapable of ejaculation. *Id.*

Appellant claims that Dr. Charles' testimony regarding Appellant's ability to ejaculate did not actually rebut the testimony of Dr. Orland, and therefore it was improperly admitted as rebuttal. Appellant cites *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761 (2004), and *Commonwealth v. Hickman*, 453 Pa. 427, 309 A.2d 564 (1973), to support his claim.

Our Supreme Court has:

repeatedly held that the order of presentation of evidence is a matter which is largely within the discretion of the trial judge. The introduction of evidence by the Commonwealth, after the defense rests its case, which could have been offered by the Commonwealth during its case in chief is not necessarily grounds for reversal. *Commonwealth v. Koch*, 446 Pa. 469, 288 A.2d 791 (1972). Evidence is admissible in rebuttal to contradict that offered by defendant or his witnesses, even though by doing so the Commonwealth supplies fatal defects in i[t]s case in chief. 2 Henry, Pennsylvania Evidence, § 730 (4th ed.1953). In addition, a party may produce evidence to rebut testimony which he himself elicited from his opponent's witness on cross-examination. *Blauvelt v. Delaware, Lackawanna & Western Railroad Co.*, 206 Pa. 141, 55 A. 857 (1903).

. . .

It is not proper to submit on rebuttal, evidence which does not in fact rebut the opponent's evidence. *Myers v. Metropolitan Life Insurance Co.*, 152 Pa.Super. 507, 33 A.2d 253 (1943). The admission of testimony which is not strictly rebuttal, however, is within the discre-

tion of the trial court and, if relevant, the fact that it was offered in rebuttal when it should have been offered in chief is not alone grounds for reversal. *Commonwealth v. Hradesky*, 170 Pa.Super. 24, 29, 842 [84] A.2d 393, 396 (1951).

*Hickman*, 309 A.2d at 567.

In *Hickman*, the appellant argued:

that a new trial [was] required because of prejudicial error in the admission of the Commonwealth's rebuttal evidence. During the Commonwealth's case in chief the testimony had established that the murder weapon was a .32 caliber automatic pistol, but had failed to link any such weapon to the appellant. The appellant later took the stand on his own behalf and was asked on cross-examination if he had ever owned a .32 caliber Beretta pistol, if he had ever been to the Hughes Gunsmith Shop, and in particular whether he had taken a .32 caliber Beretta automatic to that gun shop for repairs on January 2, 1970. To all these inquiries appellant responded in the negative.

In rebuttal, the Commonwealth called Edward L. Hughes, owner of the gun shop. Hughes testified that on January 2, 1970, the appellant had brought a Beretta pistol to him for repair, and that he, Hughes, had fired several bullets into a bullet trap. Hughes testified that he later recovered approximately eighty .32 caliber bullets which had been accumulating in the trap for ten years. These bullets later came into the possession of William Valenta, the Commonwealth's ballistic expert, who testified that two of the bullets had been fired from the murder weapon. Appellant objected to this testimony as improper rebuttal evidence.

*Id.* Our Supreme Court held that

[c]learly, the testimony of Mr. Hughes which contradicted the appellant's testi-

mony on cross-examination was properly admitted as rebuttal. The further testimony by Mr. Hughes describing shooting the pistol into the bullet trap, retrieving the bullets and handing them over to the police would be admissible, as held by the lower court, as an elaboration of the previous rebuttal testimony.

*Id.*

However, the Supreme Court rejected the admission of rebuttal by an officer whose testimony indicated that "two of the bullets fired [into] the bullet trap [had] been fired from the murder weapon." *Id.* The Court reasoned that:

> [l]inking the murder weapon to the appellant was important evidence for the Commonwealth and should have been offered, if possible, in its case in chief. Even if the only bullets which had ever been fired into the bullet trap had been from the pistol brought in by the appellant, the fact that those bullets matched the fatal bullets can in no way be said to *rebut* appellant's statements that he had never owned a .32 caliber pistol nor visited the Hughes Gun Shop.

*Id.* (emphasis in original). Furthermore, the *Hickman* court determined that, "more importantly," the officer's testimony was not relevant and, thus, "it was not admissible even if presented in the Commonwealth's case in chief." *Id.*

In *Hughes,* a death penalty case, the rebuttal issue before our Supreme Court was set forth as follows:

> prior to the commencement of the penalty phase, trial counsel sought rulings respecting the presentation of evidence bearing upon certain mitigating circumstances, including whether the assertion that [a]ppellant did not have a significant history of prior criminal convictions, would allow the Commonwealth to rebut such claim with evidence that, as a

13-year-old juvenile in 1976, [a]ppellant had sexually assaulted a minor female in a vacant house at knifepoint. In this regard, the Commonwealth intended to call the detective who investigated that incident to testify to statements he elicited from witnesses and [a]ppellant. Notably, [a]ppellant received a consent decree disposition for the 1976 offenses. The trial court ruled that, if [a]ppellant offered the no significant history mitigating circumstance, the Commonwealth would be permitted to present testimony from the detective, but not the juvenile record.

*Hughes,* 865 A.2d at 793–94.

Because "[a] consent decree does not involve a finding of guilt ... [,]" it "would not have met the criteria for a criminal conviction and, consequently, would not have been admissible to rebut the no significant history mitigator." *Id.* at 795. Our Supreme Court concluded that "where, as here, there has not been a conviction or a finding of guilt, we decline to view the evidence as constituting proper rebuttal. Similarly, as [a]ppellant did not present any character evidence, proof of the prior assault would not have been admissible as rebuttal on this basis." *Id.* at 796.

■ Turning back to the instant case, we conclude that the trial court did not abuse its discretion by determining that Dr. Charles' testimony was admissible as rebuttal. Appellant's expert, Dr. Orland, was presented for the purpose of establishing the impossibility of the allegation of penetration, a fact necessary to establish rape or aggravated indecent assault. Dr. Charles' testimony that Appellant could penetrate or touch the outer portion of the victim's vagina was squarely within the realm of direct rebuttal to Dr. Orland's testimony that no vaginal pen-

etration was possible. Both the rape[7] and aggravated indecent assault[8] statutes require only slight penetration, and do not necessarily require "intercourse" as is understood within the medical or common usage of that term. Thus, the distinction between the possibility of achieving slight penetration, as testified to by the Commonwealth's expert, and no penetration, as testified to by Appellant's expert, was a relevant inquiry. Additionally, it was proper fodder for rebuttal, because the essence of Dr. Orland's testimony was that penetration was not possible, whereas Dr. Charles' testimony indicated that some degree of penetration was possible, even though both experts agreed that Appellant's penis could not fully enter a vagina due to his erectile dysfunction. Nonetheless, Appellant appears to have won the battle of experts on this point, as he was acquitted of all offenses requiring any degree of penetration.

■ With regard to Dr. Charles' testimony regarding Appellant's ability to ejaculate, that testimony was not unambiguously rebuttal testimony, as Dr. Orland never discussed the matter of ejaculation directly. However, Dr. Orland did state, rather broadly, that Appellant's infirmity impaired his ability to engage in "sexual activity." Dr. Charles' testimony with regard to the capabilities of a person with erectile function—and the ability to ejaculate despite the inability to maintain full erection—was a particularly relevant fact in the instant case with respect to the credibility of B.M.

There was a potential risk that the jury may have inferred from Dr. Orland's testi-

mony that erectile dysfunction, in impairing "sexual activity", also impaired the ability to ejaculate. As the trial court explained, "[t]he further testimony of Dr. Charles, stating that the existence of erectile dysfunction would not prevent ejaculation, was merely an elaboration of the previous rebuttal testimony and what qualifies as 'sexual activity.'" Accordingly, the trial court admitted the testimony, citing *Hickman*, as merely elaborative of the admissible rebuttal testimony. We agree with this assessment. Once Appellant opened the door by raising doubts by means of expert medical testimony regarding his capability to engage in sexual activity due to erectile dysfunction, the Commonwealth's expert's foray into Appellant's ability to ejaculate was not improper. It was fair game, both as an elaborative rebuttal to the broad claim that Appellant was incapable of sexual activity, and as a more specific elaboration on the extent of impairment cause by erectile dysfunction. Accordingly, we find that the trial court did not abuse its discretion by allowing the rebuttal testimony of Dr. Charles.

Appellant's third claim asserts that the trial court erred by permitting B.M.'s handwritten statement to go out with the jury during their deliberations, over Appellant's objection. This statement, which was in the form of a journal entry, was admitted earlier into evidence by motion of the Commonwealth, without objection, as exhibit C–2. Appellant contends that this error was aggravated by the fact that there were no time constraints placed upon the jury's exposure to the document, as it remained with the jury until their deliberations had concluded. Appellant asserts

---

7. 18 Pa.C.S. § 3121 (incorporating the term "sexual intercourse" as defined by 18 Pa.C.S. § 3101 ("In addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration, however slight; emission is not required.")).

8. 18 Pa.C.S. § 3125 (requiring "penetration, however slight, of the genitals or anus of a complainant . . . ").

that publication to the jury in these circumstances unjustifiably risked that the jury would place undue emphasis on the document. He claims that not only did publishing of the document unduly emphasize the testimony of B.M., but also that it drew undue attention to the victim's vivid account of the effects of Appellant's behavior, as the journal contained language written by B.M. that stated that Appellant "has mentally and physically messed me up in all of ways [sic] you could think of . . ." and that seeing Appellant caused her to have flashbacks of the assaults.

Appellant argues that this was particularly prejudicial because it was the theory of the defense that the allegations of sexual abuse were fabricated. Appellant maintains that "[h]otly contested in this trial . . . was the issue of when and why B.M. wrote the journal." Appellant's Brief, at 20. A.M. testified that she had instructed B.M. to write the statement just after B.M. first disclosed the sexual abuse to A.M., whereas Detective Cornish testified later that B.M. told him that she had written it a month before she told A.M. N.T., 12/2/10, at 68, 162. Apart from the timing of the writing, Appellant also argues that this theory was supported by the fact that Appellant's daughter testified that A.M. told her that A.M. hated Appellant's wife, and that A.M. had said that "she wished [Appellant's wife] would get out of the family and stop controlling her and [her fiancé] and let them live their own life." N.T., 12/3/10, at 92–93. Appellant also contends that the allegations surfaced only a week after A.M. and Appellant's wife had a disagreement about a birthday party. N.T., 12/2/10, at 200–202. Appellant contends that "[t]he accusations brought against [him] effectively assured that [his wife] would be 'out of the family.'" Appellant's Brief, at 21.

When the Commonwealth initially requested that C–2 be published to the jury, the trial court denied the request (without an objection by Appellant), stating, "the basis for that is I think if I do that, that would receive undue influence and consideration." N.T., 12/3/10, at 32. Subsequently, the jurors requested C–2 and the illustrations on which B.M. and M.W. had indicated the locations where they were touched by Appellant. *Id.* at 33. Defense counsel objected to sending C–2 out to the jury, but not the illustrations ("I would object to the letter going out although I understand there is a specific request for it."). *Id.* at 36.

The trial court permitted C–2 to be published to the jury. The trial court explained:

> In granting the jury's request, this Court stated that while the Commonwealth's request to send out the letter/journal entry was initially denied, it was denied at that time only because it was the sole piece of evidence being requested, and as such, might be given undue emphasis. When the jury made their specific request for this evidence, it was requested in conjunction with additional items, and, as such, would not be the only piece of evidence for them to review.

T.C.O., at 23.

Pa.R.Crim.P. 646 governs "Material Permitted in Possession of the Jury." The rule states, in pertinent part, that:

> (A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C).
>
> . . . .
>
> (C) During deliberations, the jury shall not be permitted to have:
>
> (1) a transcript of any trial testimony;

(2) a copy of any written or otherwise recorded confession by the defendant;

(3) a copy of the information; and

(4) except as provided in paragraph (B), written jury instructions.

Pa.R.Crim.P. 646. "Whether an exhibit should be allowed to go out with the jury during its deliberation is within the sound discretion of the trial judge." *Commonwealth v. Merbah*, 270 Pa.Super. 190, 411 A.2d 244, 247 (1979) (citing *Commonwealth v. Pitts*, 450 Pa. 359, 301 A.2d 646 (1973)); Pa.R.Crim.P. 1114 (renumbered 646, effective April 1, 2001).

> The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice per se and the error is harmless.

*Commonwealth v. Dupre*, 866 A.2d 1089, 1103 (Pa.Super.2005) (quoting *Commonwealth v. Strong*, 575 Pa. 433, 836 A.2d 884, 888 (2003)). We note that the written statement in question is not specifically prohibited by Pa.R.Crim.P. 646(C), and therefore publication to the jury falls squarely within the discretion of the trial court and, thus, the decision cannot be overturned absent an abuse of discretion.

Pennsylvania courts have permitted a myriad of items to be in the possession of juries during deliberations. *See Commonwealth v. Sparks*, 351 Pa.Super. 320, 505 A.2d 1002, 1006 (1986) (in a prosecution for rape and aggravated assault, photographs taken of the victim shortly after the incident were permitted to go out with the jury, where the "court was careful to release only those photographs necessary to aid the jury in its deliberations. Moreover, the photographs which were released were relevant, admitted into evidence, and requested by the jury."); *Commonwealth v. Gallagher*, 353 Pa.Super. 426, 510 A.2d 735 (1986), *order rev'd on other grounds*, 519 Pa. 291, 547 A.2d 355 (1988) (jury given two mug shots of the defendant that had been admitted into evidence without objection); *Commonwealth v. Brueckner*, 458 Pa. 39, 326 A.2d 403 (1974) (jury given three black and white photographs of the body of a murder victim, where the evidentiary value of the photographs was found to outweigh the likelihood of inflaming the minds and passions of the jury, and where those photographs would assist the jury in finding intent to kill by the location of the wounds); *Commonwealth v. Hobson*, 484 Pa. 250, 398 A.2d 1364, 1366–67 (1979) (jury given a revolver, where "the weapon [was] not of such character as to require continued expert interpretation for the jury to properly evaluate the evidence."); *Dupre*, 866 A.2d at 1103 (jury given a model depicting an adult's larynx, whereas the actual victim was an infant, but where the "appellant did not object when these exhibits were introduced into evidence, but rather only objected to the court's decision as to what exhibits would go to the jury room.")

Our courts have rarely found that materials given to juries during deliberations constitute reversible error. In the cases that have found reversible error, however, the prejudicial effect of the evidence in question was severe and readily apparent. For instance, in *Commonwealth v. Bricker*, 525 Pa. 362, 581 A.2d 147 (1990), the trial court sent out with the jury two written plea agreements made by two witnesses whose testimony had been fundamental to the case against the appellant. Our Supreme Court found this deprived the appellant of a fair trial, stating that it was "beyond question that permitting the prosecution to send these documents out with

the jury during deliberations impermissibly bolstered the credibility of [the witnesses]. In so bolstering their credibility, the court violated the defendant's right to a fair trial." *Id.* at 154. The Supreme Court found the error was not harmless because,

> [w]ith the agreements before them, the jurors could reasonably infer that appellant had the same opportunity as [the witnesses] to cooperate with the investigation of Thomas Sacco's death, and chose to remain silent. The fact that [the] appellant did not take the stand in his own defense further bolsters his claim that there is a reasonable possibility that this error might have contributed to the verdict.

*Id.* at 155.

In *Commonwealth v. Dennison,* 254 Pa.Super. 284, 385 A.2d 1021 (1978), the appellant had been "found guilty by a jury of failing to support a bastard child." *Id.* at 1022. The trial court had permitted the jury to possess, during deliberations, a love letter written by the appellant to the mother of the child for whom paternity was in doubt. *Id.* The Commonwealth contended at trial that the letter had been written one week after the romantic interlude that had allegedly resulted in the conception of the child. *Id.* Of particular concern was language that read: "I don't know what your mother plans on doing if you are pregnant and I don't really care as long as I know you love me and won't ever go away from me." *Id.*

In considering whether the trial court abused its discretion in permitting the note to go out with the jury, we reasoned:

> It obviously is a "love note," but the question is whether it implies more, thereby, rendering it a confession of paternity. The [above quoted] sentence is the crucial one. Does it mean that they had had sexual relations under condi-

tions that might result in her pregnancy, about which he was concerned because of her mother's reaction; or does it mean that he had not had sexual relations with her, but he loved her regardless of the fact that he knew she had had relations with someone else which might have resulted in her pregnancy and cause her mother to react?

> We find the former to be more plausible. The letter was such that the jury might have interpreted it as a confession that the defendant had had sexual relations with the prosecutrix, one of the necessary elements on which the charge against him was based, and finding that, might imply from his concerns about the mother's reaction to her daughter's pregnancy, that he was the father of the child. Thus it might have concluded that it was a confession of paternity.

*Id.* at 1022–23. Accordingly, we concluded that the trial court committed prejudicial error in permitting the jury to have possession of [the note] during its deliberation because it was a functional equivalent of a confession, and confessions are specifically prohibited by Pa.R.Crim.P. 646 (then numbered 1114).

In the instant case, Appellant failed to object when B.M.'s statement was initially admitted into evidence. Furthermore, the jury specifically requested B.M.'s statement. Both of these circumstances have been previously found to be factors tending to militate against a finding of prejudice. *See Gallagher, supra* (failure to object); *Sparks, supra* (jury request). Also weighing against a finding of prejudicial error is that, as the trial court reasoned in this case, the risk of over-emphasis was mitigated by the fact that B.M.'s statement would not be the only exhibit in the possession of the jury. The statement was relevant in that it de-

scribed particular occasions of sexual abuse committed by Appellant, and because it served as a prior consistent statement to B.M.'s testimony, as well as lending credibility to the testimony of A.M. and Cornish regarding B.M.'s prior statements.

There was, to be sure, a potential risk that B.M.'s statement could inflame the passions of the jury, particularly where the statement described the effect the sexual abuse had on her. Appellant's objection, however, failed to offer any alternative, such as having a redacted version of the letter that omitted any particularly inflammatory language. In any event, the content of the statement in this case falls short in scope of the expected inflammatory effect of photographs taken of a victim immediately after a sexual assault, *Sparks, supra;* mug shots of the accused, *Gallagher, supra;* or photos of a murder victim, *Brueckner, supra.* Furthermore, B.M.'s statement does not bear resemblance to any materials specifically prohibited by Pa. R.Crim.P. 646.

Accordingly, we conclude that the balance of factors addressed above demonstrate that the trial court did not abuse its discretion in permitting B.M.'s statement to go out with the jury. The statement was relevant evidence, it was specifically requested by the jury, and when originally admitted into evidence, Appellant failed to assert an objection. Any potential prejudice was mitigated by the fact that it was not the sole piece of evidence in the possession of the jury, it was not similar in nature to specifically prohibited evidence, and it was not so inflammatory in nature as to risk that the jury would be unable to rationally evaluate the evidence and reach a reasoned verdict.

Appellant's final issue contends that the mandatory sentence of 25–50 years' incarceration, imposed pursuant to 42 Pa.C.S. § 9718.2, constituted cruel and unusual punishment. Appellant contends our recent decision in *Commonwealth v. Baker,* 24 A.3d 1006 (2011), was wrongly decided, and that the statute, as applied to him in the specific circumstances of this case, violated the Eighth Amendment to the United States Constitution and Article I, § 13 of Pennsylvania Constitution.

 In reviewing the constitutionality of a duly enacted statute, we are mindful of the following considerations:

The Pennsylvania Supreme Court has consistently held that enactments of the General Assembly enjoy a strong presumption of constitutionality. *Commonwealth v. Barud,* 545 Pa. 297, 304, 681 A.2d 162, 165 (1996) (citing *Commonwealth v. Mikulan,* 504 Pa. 244, 247, 470 A.2d 1339, 1340 (1983)). All doubts are to be resolved in favor of sustaining the constitutionality of the legislation. *Commonwealth v. Blystone,* 519 Pa. 450, 463, 549 A.2d 81, 87 (1988), *affirmed,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (citing *Hayes v. Erie Ins. Exchange,* 493 Pa. 150, 155, 425 A.2d 419, 421 (1981)). "[N]othing but a clear violation of the Constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void." *Glancey v. Casey,* 447 Pa. 77, 88, 288 A.2d 812, 818 (1972) (citing *Busser v. Snyder,* 282 Pa. 440, 449, 128 A. 80 (1925)). In other words, "we are obliged to exercise every reasonable attempt to vindicate the constitutionality of a statute and uphold its provisions." *Commonwealth v. Chilcote,* 396 Pa.Super. 106, 578 A.2d 429, 435 (1990) (citing *Commonwealth v. Trill,* 374 Pa.Super. 549, 543 A.2d 1106, 1116 (1988)). "The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibili-

ties so grave that it is never to be exercised except in very clear cases." *Erie & North–East Railroad Co. v. Casey,* 26 Pa. 287, 300 (1856). Moreover, one of the most firmly established principles of our law is that the challenging party has a heavy burden of proving an act unconstitutional. *Barud,* 545 Pa. at 304, 681 A.2d at 165. In order for an act to be declared unconstitutional, the challenging party must prove the act "clearly, palpably and plainly" violates the constitution. *Barud,* 545 Pa. at 304, 681 A.2d at 165. *See Blystone, supra.* Finally, we note that:

> The power of judicial review must not be used as a means by which the courts might substitute its judgment as to public policy for that of the legislature. The role of the judiciary is not to question the wisdom of the action of [the] legislative body, but only to see that it passes constitutional muster.

*Finucane v. Pennsylvania Marketing Bd.,* 136 Pa.Cmwlth. 272, 582 A.2d 1152, 1154 (1990) (citations omitted).

*Commonwealth v. Smith,* 732 A.2d 1226, 1235–36 (Pa.Super.1999) *aff'd,* 575 Pa. 203, 836 A.2d 5 (2003).

▮ This Court has consistently held that "[t]he Pennsylvania prohibition against cruel and unusual punishment is coextensive with the Eighth and Fourteenth Amendment of the United States Constitution" and, thus, "the Pennsylvania Constitution affords no broader protection against excessive sentences than that provided by the Eighth Amendment to the United States Constitution." *Commonwealth v. Yasipour,* 957 A.2d 734, 743 (Pa.Super.2008); *see also Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982). For this reason, and because Appellant has failed to develop any argument why Pennsylvania's prohibition against cruel and unusual punishment under Article I, Section 13 establishes greater protection than that afforded by the federal constitution, we address Appellant's claim only as a challenge under the Eighth Amendment to the United States Constitution.[9] *See Commonwealth v. Parker,* 718 A.2d 1266, 1268 (Pa.Super.1998) (Because "our analysis of this case under the United States constitution is applicable to the state constitution ... we need not engage in a separate state constitutional review").

▮ Appellant raises both facial and as-applied challenges to 42 Pa.C.S. § 9718.2. The Supreme Court of the United States recently set forth the standard for facial challenges as follows:

> Under *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," *i.e.,* that the law is unconstitutional in all of its applications. *Id.,* at 745, 107 S.Ct. 2095. While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a " 'plainly legitimate sweep.' " *Washington v. Glucksberg,* 521 U.S. 702, 739–740, and n. 7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (STEVENS, J., concurring in judgments).

*Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449,

---

9. We are aware, however, that our Supreme Court recently granted allowance of appeal on the following question: "[d]oes the 25–year mandatory minimum sentence of imprisonment imposed under 42 Pa.C.S. § 9718.2 violate Article I, Section 13 of the Pennsylvania Constitution as it is grossly disproportionate to the crime?" *Commonwealth v. Baker,* —— Pa. ——, 35 A.3d 3 (2012).

128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). Appellant's brief fails to invoke any language or argument suggesting 42 Pa.C.S. § 9718.2 is unconstitutional in all its applications under the *Salerno* standard, or that the statute fails the "plainly legitimate sweep" test under the *Glucksberg* standard. Appellant's brief only contains arguments that the statute is unconstitutional in its application to the specific circumstances attendant to Appellant's conviction. We, therefore, conclude Appellant has failed to properly develop a facial challenge, and has instead only challenged the constitutionality of 42 Pa.C.S. § 9718.2 as applied in the instant case.

 The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court of the United States has long held that "[t]he final clause prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." *Solem v. Helm,* 463 U.S. 277, 284, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). However, "the Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences which are grossly disproportionate to the crime." *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 209 (1997) (quoting *Harmelin v. Michigan,* 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)).

In *Commonwealth v. Parker,* 718 A.2d 1266, 1268 (Pa.Super.1998), we were asked to consider if a defendant's sentence for robbery under a recidivist statute, based on his third conviction for violent crime, was grossly disproportionate to the offense and, therefore, cruel and unusual punishment, where no actual violence occurred during the commission of the crime. We initially noted that:

> Recidivist statutes, which have been adopted in all fifty states, are not inherently unconstitutional. The policy behind them is to punish more severely defendants who are repeat offenders. Recidivist statutes serve notice on defendants that if they continue their criminal behavior they will be dealt with more harshly by the law. By incapacitating habitual criminals, citizens are safeguarded from defendants' repeated criminal activity. Recidivist statutes have repeatedly been upheld against contentions that they violate constitutional limitations on cruel and unusual punishment.

*Id.* at 1268 (citing *Parke v. Raley,* 506 U.S. 20, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992)).

In *Parker,* we relied upon *Commonwealth v. Spells,* 417 Pa.Super. 233, 612 A.2d 458 (1992) *(en banc),* stating that "only gross disproportionality between crime and sentence raises a constitutional challenge." *Parker,* 718 A.2d at 1268. We then moved on to determine the "appropriate criteria for examining the proportionality of a sentence." *Id.* We stated:

> Relying on the United States Supreme Court decision in *Harmelin v. Michigan, supra,* the *Spells* court found no disproportionality. *Harmelin* recognized that the criteria for examining the proportionality of a sentence were established in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *Solem* instructed that a court must consider: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals for the commission of the same crime in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. In *Harmelin, supra,* Justice Kennedy held that the *Solem* criteria did not form a mandatory and rigid

three-part test. Rather, in determining whether a punishment is disproportionate, the comparative test of *Solem* may not be necessary, and is required only after a showing that raises an inference of gross disproportionality. Following Justice Kennedy in *Harmelin, Spells* held that when such gross disproportionality is not shown, the second and third prongs of *Solem* are not necessary. *Parker,* 718 A.2d at 1268–69 (footnotes omitted). We then rejected "appellant's argument that since no actual violence occurred, the crime should not be considered violent." *Id.* at 1269. We concluded:

> In light of appellant's third conviction for a violent crime, we cannot say that his sentence was grossly disproportionate and therefore amounted to cruel and unusual punishment. Appellant's conduct constituted robbery which we, as we must, view as a crime of violence. Appellant committed at least three crimes that are classified as violent. He does not challenge the fact that the first one occurred nearly thirty years ago and we therefore do not consider that circumstance. Appellant by definition is a habitual offender and the policy of the law is to punish severely individuals who repeat certain criminal behavior. We therefore hold that appellant's mandatory minimum sentence of twenty-five to fifty years for his third crime of robbery is not so grossly disproportionate that it requires further inquiry or analysis.

*Id.* On this basis, we held that Parker's sentence was not cruel and unusual punishment.

We recently addressed an Eighth Amendment challenge to the statute at issue in the instant case in *Baker, supra.* Relying on *Parker* and *Spells,* we stated that "the initial inquiry is whether there is an inference of gross disproportionality between the crimes committed and the sentences imposed." *Baker,* 24 A.3d at 1028–29. We found that the appellant in *Baker,* however, did "not specifically assert that such an inference exists." *Id.* at 1029. Instead, the appellant in *Baker* only addressed the comparative analyses of the second and third prongs of the *Solem* test. Hence, we concluded that the appellant in *Baker* had "failed [to] show that his sentences violate the prohibition against cruel and unusual punishment[.]" *Id.* Here, we conclude that *Baker* is not controlling in the instant matter, beyond its statement of the appropriate standard of review, because the appellant in *Baker* failed to even assert that the statute, as applied, created an inference of gross disproportionality between the crime committed and the sentence imposed. Appellant has asserted that such an inference exists and, thus, he escapes the controlling authority of *Baker,* independent of the merits of the gross disproportionality claim.

■ Turning to the merits of the threshold inquiry, Appellant claims his sentence was grossly disproportionate because 1) the jury acquitted Appellant of the two most serious offenses, rape and aggravated indecent assault; 2) the most serious offenses for which he was convicted of was only a felony of the 3rd degree; 3) the predicate offense occurred in 1978; 4) Appellant's age at the time of sentencing, seventy, meant that he will not be eligible for parole until he is 95 years old, effectively making the mandatory minimum in this case a life sentence; and 5) Appellant presented evidence, in the form of the testimony of his wife, testifying that his daughter, the victim of his incest conviction, had made amends with Appellant. We find these reasons fail to establish an inference of gross disproportionality regarding the imposed mandatory sentence under the facts and circumstances of the instant case.

Appellant's acquittal of the most serious offense does little to suggest gross disproportionality in the instant case. Both of the acquittals likely turned on the issue of whether Appellant had achieved penetration of B.M.'s genitalia with his penis. The distinction, though of significant legal merit for purposes of determining whether a rape or an aggravated indecent assault occurred, as opposed to the offenses for which Appellant was ultimately convicted, is not particularly compelling on a moral or ethical level when considering the proportionality of the penalty to the illegal acts to which the penalty was applied. The offenses for which Appellant was convicted were due to repeated acts of sexual abuse against two prepubescent minors that occurred over the course of several years.

The United States Supreme Court has continuously upheld longer sentences, for less serious crimes, against Eighth Amendment challenges. In *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the Supreme Court held that it did not violate the Eighth Amendment for a state to sentence a three-time offender to life in prison with the possibility of parole. *Id.* at 284–85, 100 S.Ct. 1133. Rummel was sentenced under a three-strikes recidivism statute. Rummel's two prior offenses were fraudulent use of a credit card to obtain $80 worth of goods or services, and passing a forged check in the amount of $28.36. *Id.* at 265, 100 S.Ct. 1133. His triggering third offense was a conviction for obtaining $120.75 by false pretenses. *Id.* at 266, 100 S.Ct. 1133. In *Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (*per curiam*), the defendant was sentenced to two consecutive terms of twenty years in prison for possession with intent to distribute nine ounces of marijuana and distribution of marijuana. Then in *Ewing v. California*, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), the appellant had been sentenced to 25 years to life for a third strike offense. The third strike was for the theft of three golf clubs from a retail business. Justice O'Connor wrote for a plurality of the court upholding the sentence, stating that "Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" 538 U.S. at 30, 123 S.Ct. 1179 (quoting *Harmelin*, 501 U.S. at 1005, 111 S.Ct. 2680 (KENNEDY, J., concurring in part and concurring in judgment)).

*Rummel, Hutto,* and *Ewing* all adequately demonstrate that Appellant's argument regarding his acquittal for the most serious offenses in this case lacks merit. That Appellant was acquitted of more serious offenses obfuscates the issue at hand, which is an inquiry into the proportionality of the sentence to the offense for which he was convicted. Appellant was convicted of indecent contact with a minor, indecent assault, and corruption of minors against each victim in this case. These offenses are not trivial, regardless of Appellant's acquittal of rape and aggravated indecent assault. Furthermore, Appellant's convictions are more severe in terms of gravity as the offenses committed in *Rummel, Hutto,* and *Ewing;* and in this case, there is more than just one offense to consider. Indeed, Appellant could have been potentially subjected to multiple 25–50 year mandatory sentences in this case, subject to the discretion of the Commonwealth, particularly in light of the fact that there were two victims. We, therefore, afford Appellant's acquittals for rape and aggravated indecent assault little weight in our evaluation of his gross disproportionality argument.

Appellant's focus on the grading of his offenses is, likewise, unpersuasive. As

stated above, Appellant's convictions, as compared to those committed in *Rummel, Hutto,* and *Ewing,* are of sufficient gravity as to undermine any argument of gross disproportionality on that basis alone. Furthermore, by comparison, few would argue that the theft offense of receiving stolen property, which can be graded as high as a first-degree felony under 18 Pa. C.S. § 3903(a.2), presents the same harm to society as a sexual offense against a minor such as indecent assault (and in this case, we have multiple sexual offenses against two minor victims over the course of several years). There are numerous causes for such inconsistencies, many of which stem from the fact that the grading of different crimes spring from different legislative sessions over the course of many decades. This is a natural and unfortunate result of the legislative process.

Accounting for such inevitable inconsistencies, however, we can conclude that it is not the grading of the offense that makes a sentence grossly disproportionate, but the nature and gravity of the conduct in relation to the sentence that compels the inference of gross disproportionality. The grading of the offenses of indecent assault, indecent contact with a minor, and corruption of minors in this case are poor markers for the gravity of the offense committed by Appellant. Accordingly, we accord Appellant's argument, regarding the grading of the most serious offense as a third degree felony, little weight in determining if his sentence was grossly disproportionate.[10]

The next factor we consider is the contention that gross disproportionality can be inferred from the fact that Appellant's predicate offense occurred more than thirty years ago. In 1978, Appellant was convicted of incest[11] in California. Appellant does not dispute that the incest conviction serves as a predicate offense for imposition of the mandatory sentence pursuant to 42 Pa.C.S. § 9718.2. Besides merely stating the displacement in time between the two offenses, Appellant also does not develop any argument why the date of his prior conviction is relevant to an inference of gross disproportionality. On one hand, Appellant could argue that the large gap in time following his incest conviction demonstrated his ability to rehabilitate. Through a different lens, one could characterize these facts as establishing that Appellant's crimes of sexual abuse spanned three decades. In any event, though the nature of the predicate offense and its temporal displacement from the current one are relevant issues to the question of proportionality, that is not the exclusive or even primary focus when considering the proportionality of the punishment in this case. While we are inclined to conclude that the time gap in this case should weigh in favor of a determination of gross disproportionality, it is but one factor among many that we must consider, and we do not find it to be particularly compelling considered alone.

Appellant also argues that there is an inference of gross disproportionality because, due to his advanced age, the mandatory sentence imposed is essentially a life sentence. Appellant will be 95 years old when the minimum term of his sentence expires. Though it is feasible that Appellant will survive until such time as he will be eligible for parole, it is a reasonable

---

10. The trial court graded Appellant's unlawful contact conviction as a felony of the first degree. T.C.O., at 1 n.1. Appellant does not appear to have formally challenged this grading. However, because we have determined

that Appellant's argument is not convincing even based upon the lower grading, this discrepancy is of no consequence.

11. Cal.Penal Code § 285.

inference that he will not, purely as a matter of statistically probability. The defendants in *Rummel, Hutto,* and *Ewing* all received sentences that could present similar concerns, and yet the gravity of the offenses committed in those cases all fall short of the offenses for which Appellant was convicted in this case. As Justice O'Conner stated in *Ewing,* a sentence of 25 years to life under California's three strikes law, where Ewing's third offense had been for the theft of golf clubs, reflected "a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated." *Ewing,* 538 U.S. at 30, 123 S.Ct. 1179. We cannot ascertain a rational basis on which to differentiate Appellant's case from *Ewing* other than to say Appellant's sentence appears to be less disproportional than the sentence handed down in *Ewing.*

Furthermore, Appellant's age, while certainly a factor to be considered, does not always present itself as a factor weighing against a determination of gross disproportionality. There is substance to the argument that advanced age makes the sentence harsher due to the probability that Appellant will not survive it. However, one could also argue that older defendants, seasoned by the experience and wisdom garnered over the course of many decades, are entitled to less deference than young defendants whose youth makes them both more impulsive and more malleable, thus making them, simultaneously, less culpable for their conduct and more receptive to rehabilitation. Thus, Appellant's advanced age presents, at best, a mixed bag of considerations concerning proportionality.

Finally, Appellant presented testimony from his wife during his sentencing hearing. She testified as to his good character, that Appellant had been forgiven by his daughter (the victim of his prior incest conviction) and now maintains a healthy relationship with her, and that he was a changed man from the person who committed the offense in 1978. Appellant contends that this lends support to an inference of gross disproportionality.

Her testimony, premised upon the assumption that Appellant was falsely accused and convicted of the charges of sexual abuse in this case, and, without doubt, emanating from her loyalty and devotion to her spouse of many years, can only be afforded nominal weight. This Court cannot accept that assumption, as we must presume Appellant's guilt for purposes of addressing the constitutionality of his sentence. Accordingly, we do not afford her assessment of Appellant's character much weight in determining whether an inference of gross disproportionality exists in this case.

Having considered all of Appellant arguments attempting to establish an inference of gross disproportionality, we are left unconvinced. The acts of sexual abuse of two children over the course of several years committed by Appellant, even when such abuse fell short of rape on any particular occasion, constitute offenses of sufficient gravity as to permit a severe sentence. Furthermore, even absent the application of the mandatory in this case, had the trial court sentenced Appellant to the statutory maximum for each offense, and run those sentences consecutively, appellant could have been sentenced to a maximum possible penalty of 24½–49 years' incarceration.[12] As such,

---

12. The trial court opinion listed the grading of the offenses for which Appellant was con-victed as follows: indecent contact (B.M.), first degree felony; indecent contact (M.W.),

the sentence applied in the instant case is not substantially higher than the maximum possible penalty available to the sentencing court had the Commonwealth chosen not to invoke the mandatory. While Appellant's age and the temporal displacement between the predicate and current offenses tend to demonstrate some degree of disproportionality, we cannot discern gross disproportionality in these circumstances. Because Appellant has failed to breach the threshold question, we conclude that his mandatory sentence did not constitute cruel and unusual punishment as applied in this case.

In sum, we first reject Appellant's claim that the statements of B.M. and M.W. were impermissibly admitted pursuant to the Tender Years Statute. Second, we conclude that the Commonwealth's expert testimony was properly admitted as rebuttal testimony to Appellant's expert. Third, we hold that the trial court did not err when it permitted the jury to examine B.M.'s handwritten statement. Finally, we conclude that Appellant's mandatory 25–50 year sentence does not constitute cruel and unusual punishment.

Judgment of sentence affirmed.

third degree felony; indecent assault (B.M.), third degree felony; indecent assault (M.W.), first degree misdemeanor; corruption of minors (B.M. and M.W.), each a misdemeanor of the first degree.