J-A09009-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSEPH TUNSTALL, | |
| Appellant | No. 904 EDA 2014 |

Appeal from the Judgment of Sentence November 25, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009724-2011

BEFORE: BOWES, DONOHUE, AND STABILE, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 25, 2015**

Joseph Tunstall appeals from the judgment of sentence of life imprisonment that the trial court imposed after a jury convicted him of first-degree murder, criminal conspiracy, and possession of a firearm without a license. We affirm.

At 12:55 a.m., on January 30, 2011, Kelly Nelson was shot and killed in the Hill Creek Public Housing Community ("Hill Creek") in Philadelphia, Pennsylvania. In the aftermath of the murder, Commonwealth investigators uncovered the following facts. On January 29, 2011, the victim's older cousin, Warren Darrell Wright, was drinking at the Grand Slam, a neighborhood bar, with Appellant's niece, Jamira Tunstall, and a group of her friends. N.T., 11/21/13, at 100. Mr. Wright and Ms. Tunstall were playing a

touchscreen computer game on the bar-top together when Wright asked her if she would end her conflict with his friend, Danielle Doebler. *Id*. at 101. This request resulted in a verbal confrontation between Mr. Wright and Ms. Tunstall, which supposedly culminated in Mr. Wright hitting and/or grabbing Ms. Tunstall. N.T., 11/20/13, at 30. As a result, both patrons were asked to leave the establishment. N.T., 11/19/13, at 199.

According to testimony adduced at trial, only Ms. Tunstall left the bar after the argument. *Id*. at 196. However, she returned approximately forty-five minutes later, and the argument with Mr. Wright resumed. *Id*. at 199. Diana Koba, a patron in the bar, testified that, prior to both parties leaving the bar permanently, Ms. Tunstall claimed that she was going to "make a phone call to her people." *Id*. at 195. Moreover, Ms. Tunstall herself later testified that she called Appellant and asked him to go to the Grand Slam to fight Mr. Wright because Wright had hit her. N.T., 11/20/13, at 37-40.

Mr. Wright later returned to his residence, which he shared with the victim, and told him about his argument with Ms. Tunstall. *Id*. at 103-104. The victim attempted to calm Mr. Wright, but Wright left the house to visit Ms. Doebler. *Id*. at 105. The victim later went to the Grand Slam to find Mr. Wright. He ordered one drink and left after he had consumed it. N.T., 11/19/13, at 202. He was murdered shortly thereafter, and his body was discovered with the straw from this drink still in his mouth. The victim was

pronounced dead at the scene, suffering a total of ten gunshot wounds. *Id*. at 87-100, 102. Police recovered fourteen fired cartridges, which included three 9 millimeter and eleven .40 caliber shells. N.T., 11/21/13, at 13, 36, 40, 78-81.

Testimony began on November 19, 2013. The Commonwealth's first witness was medical examiner, Dr. Gary Collins, who testified to the number of wounds that the victim had suffered and confirmed that the wounds were the cause of death. N.T., 11/19/13, at 102. The Commonwealth also presented F.B.I. Special Agent, William Shute, who was qualified as an expert on cellular telephone site analysis. *Id*. at 108, 133. Special Agent Shute testified that he tracked cellular telephone calls and text messages between Appellant and Ms. Tunstall from January 29, 2011, at 11:35 p.m., until January 30, 2011, at 1:10 a.m. *Id*. at 138-139. This tracking was accomplished via the use of cellular towers, which indicated that Appellant's cell phone was in the area around Hill Creek at the time of the victim's death, and was then identified moving away from that location. *Id*. at 157-160.

The Commonwealth called Darren Rogers as an eyewitness to the shooting. During the murder investigation, Mr. Rogers informed Philadelphia Detectives Gregory Santamala and Joseph Pirrone that, on the night of the murder, he witnessed Appellant and a group of armed men surround the victim while Appellant screamed, "your peoples [sic] slapped my niece."

N.T., 11/21/13, at 200. Rogers then stated that he witnessed Appellant with a gun in his hand, before observing flashes in front of Appellant, accompanied by the sound of gunshots. *Id*. However, when questioned at trial about these statements, Mr. Rogers denied witnessing the shooting. He stated that he was released from jail the night of the shooting, got high on drugs at his girlfriend's house, and was asleep when the shooting occurred. *Id*. at 241-242, 294-295. Mr. Rogers had also previously denied witnessing the shooting at the preliminary hearing. He testified at trial that he did not remember making any of the prior statements to the detectives because he was also high during his police interview. *Id*. at 284, 301-304.

Ms. Tunstall was called on the second day of trial, November 20, 2013. N.T., 11/20/13, at 15. She testified that she was in an intimate relationship with Mr. Wright when the murder occurred. She also acknowledged that she and Mr. Wright had argued over her interactions with Danielle Doebler. This episode ended after Mr. Wright grabbed her by the neck and she left the bar for the first time. *Id*. at 15-17, 21, 28-31. Ms. Tunstall also claimed that when she came back to the bar, Mr. Wright began to yell at her again and punched her in the face. *Id*. at 35. She asserted that, although she did call Appellant to have him come and assault Mr. Wright as retaliation for his actions in the bar, she never asked Appellant to shoot or kill Mr. Wright. *Id*. at 40, 88. Ms. Tunstall confirmed that Appellant, another uncle Jerome Tunstall, and her aunt Toya Tunstall, arrived at Hill Creek in response to her

- 4 -

request; but testified that she did not see either of her uncles in possession of weapons. *Id*. at 42. Finally, Ms. Tunstall agreed that she previously pled guilty to criminal solicitation and conspiracy in relation to the murder. *Id*. at 57, 64.

The Commonwealth's next witness was Quinton Gamble. Mr. Gamble confirmed that he was currently in custody for failing to comply with a subpoena to appear to testify in the instant case. *Id*. at 106-107. Mr. Gamble explained that investigators brought him to the police station two weeks after the homicide and he gave a statement to homicide detectives. In that statement, Mr. Gamble stated that Appellant and his brother appeared at his house on the night of the murder and asked him if he had seen Mr. Wright that night. *Id*. at 114. Mr. Gamble continued in his statement that, after informing Appellant that he had not had contact with Mr. Wright, Appellant's brother brandished a firearm, and both brothers implied that they were going to look for Wright at the Grand Slam. *Id*. Mr. Gamble's statement also indicated that, around twenty minutes later, he heard gunshots from the direction of the shooting and observed Appellant, his brother, and another man run down the street, enter a car, and flee. *Id*.

During his direct examination, however, Mr. Gamble changed aspects of the prior statement that he gave to the homicide detectives. In contrast to his earlier identification of Appellant and his brother, Mr. Gamble now claimed that all he observed after hearing the gunfire were two people

- 5 -

running past his house with guns and that it was too dark for him to be able to accurately describe the assailants. *Id*. at 112. On cross-examination, Mr. Gamble further recanted his prior statement that he observed Appellant in the vicinity of the murder, although he later acknowledged that he identified one of the individuals who ran by his house that night as Appellant's brother. *Id*. at 129.

The Commonwealth also called Philadelphia Police Detective George Pirrone and Philadelphia Police Officers Sean Kennelly and Edgar Ruth. *Id*. at 144, 165, 176. Detective Pirrone acknowledged taking the statements of both Ms. Tunstall and Mr. Gamble, while Officer Kennelly testified that he was the officer who arrested Appellant on June 4, 2011. *Id*. at 148-151, 168. Officer Ruth then informed the court that Appellant had shared a holding cell with Mr. Gamble as both were waiting to testify in these proceedings and that Appellant attempted to engage Mr. Gamble, who uses the alias "Q," in conversation by shouting, "Q, come on," and directing him, "you know what you gotta do." *Id*. at 179-180. Officer Ruth also stated that, at this point, Mr. Gamble acknowledged Appellant by responding "I didn't see shit, I didn't see it, I don't remember." *Id*. at 180.

Investigator William Whitehouse of the Crime Scene Unit and Philadelphia Police Officer Ernest Bottomer from the Ballistics Unit were the Commonwealth's next two witnesses. They testified about the locations of the various shell casings at the crime scene as well as confirming that the

bullets recovered from the victim's body matched these shell casings. N.T., 11/21/13, at 40-53, 74-75. Officer Bottomer further confirmed that all of the recovered bullets and casings came from either a 9mm or .40 caliber firearm. *Id*. at 75.

The next witness was Mr. Wright, who confirmed that he had been in a relationship with Ms. Tunstall and requested that she not confront Ms. Doebler. *Id*. at 100. Mr. Wright also acknowledged that he and Ms. Tunstall had gotten into a verbal confrontation at the bar but denied striking her. *Id*. at 102. He further stated that he texted Ms. Tunstall at 2:04 a.m. that morning and informed her that Appellant had killed his cousin instead of him; to which Ms. Tunstall responded with a text that read, "I'm sorry for your loss, but you're not going to threaten me." *Id*. at 120-121.

Finally, the Commonwealth called Philadelphia Police Detective Gregory Santamala. *Id*. at 170. Detective Santamala testified concerning text messages between Appellant and others on the morning of the victim's death that implied that Appellant may have been involved with the shooting. *Id*. at 170, 181-183. Detective Santamala also explained that, since Mr. Rogers was under the influence of drugs when he was first brought to the police station for his interview at 11:00 am on February 14, 2011, he remained at the station for approximately twenty-nine and one-half hours until he was sober enough up to give an accurate statement. *Id*. at 191, 207-215.

After the Commonwealth rested, Appellant testified on his own behalf. He confirmed that he had received a phone call from Ms. Tunstall around 11:52 p.m., and was informed that Mr. Wright had punched her in the face. N.T., 11/22/13, at 22-23, 29. He also admitted to coming to Hill Creek that night and searching the Grand Slam for Mr. Wright, but claimed that his only purpose was to threaten Mr. Wright with physical violence if he hit Ms. Tunstall again. *Id*. at 30-32. Appellant also asserted that he was not involved in the murder and that it was not until he was leaving Hill Creek that he heard any gunshots. *Id*. at 35-36.

Appellant called one additional witness, Tierra Nesmith, who was Mr. Rogers's girlfriend at the time of the shooting. She testified that Mr. Rogers was with her for most of the night in question. Ms. Nesmith stated that Mr. Rogers returned to Hill Creek earlier that evening, got high on Xanax, and then went to sleep around 10:00 p.m. *Id*. at 137-140. Although Ms. Nesmith acknowledged that she briefly visited the Grand Slam and witnessed Mr. Wright striking Appellant's niece, she continued to assert that she remained with Mr. Rogers between 12:00 a.m. and 1:00 a.m. on Sunday and that Mr. Rogers was not in a position to make any observations of the shooting during this time period because he remained asleep. *Id*. 140-142. She also explained that she had a previous romantic relationship with Appellant and that Mr. Rogers held ill will toward Appellant as a result. *Id*. at 142-143.

The jury convicted Appellant on all counts on November 25, 2013, and he was sentenced to life imprisonment. N.T., 11/25/13, at 114-115, 128. Appellant filed post-sentence motions seeking a new trial and arrest of judgment on November 26, 2013. These motions were denied on March 14, 2014. Appellant then filed a timely notice of appeal.

Appellant presents the following issues for our review:

1. Were Appellant's convictions for Murder of the First Degree (18 Pa.C.S.A. 2502), Criminal Conspiracy to Commit Murder (18 Pa.C.S.A 903), and Violation of the Uniform Firearms Act (18 Pa.C.S.A 6106), not supported by sufficient evidence?

2. Were the convictions for Murder of the First Degree, Criminal Conspiracy to Commit Murder, and Violation of the Uniform Firearms Act against the weight of the evidence?

3. Did the trial judge err in not granting a mistrial after the Assistant District Attorney: made inflammatory statements, statements of personal opinion, improperly personally vouched for witnesses, improperly gave testimony not of record, and left a photograph of the deceased victim on the screen in front of the jury during his opening and closing statements?

4. Did Judge Bronson err in allowing the two written statements of the key prosecution witness, Darren Rogers, as well as Appellant's text messages, to go back with the jury because this evidence only favored the prosecution, thereby tainting the jury's deliberation and verdict?

Appellant's brief at 6-7.

Appellant's first challenge is to the sufficiency of the evidence presented by the Commonwealth at trial. Appellant asserts that the testimony of two key Commonwealth witnesses was so "contradictory, unreliable, and speculative," that it was insufficient as a matter of law to

support his convictions for first-degree murder, criminal conspiracy, and carrying a firearm without a license. Appellant's brief at 40. At the outset, we observe that this claim resonates as a challenge to the weight of the evidence. This observation is bolstered by the fact that Appellant specifically incorporates the identical argument in support of his subsequent weight of the evidence claim.

Generally, "[o]ur standard when reviewing the sufficiency of the evidence is whether the evidence at trial, and reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt." *Commonwealth v. Love*, 896 A.2d 1276, 1283 (Pa. Super. 2006). Conflicting testimony between witnesses does not render the evidence insufficient because it is within the province of the factfinder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence. *Commonwealth v. Rabold*, 920 A.2d 857, 859 (Pa.Super. 2007). In addition, the Commonwealth may sustain its burden of proof based entirely on circumstantial evidence. *Commonwealth v. Laird*, 988 A.2d 618, 624 (Pa. 2010). "[A]ny doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa.Super. 2013) (*en banc*).

- 10 -

Appellant recognizes that weight-related considerations are generally excluded from the review of the sufficiency of the evidence, however, he argues that the pertinent standard of review has been altered as a result of our Supreme Court's holding in *Commonwealth v. Karkaria*, 625 A.2d 1167 (Pa. 1993) and *Commonwealth v. Farquharson*, 354 A.2d 545 (Pa. 1976). In *Karkaria*, our Supreme Court addressed a sufficiency of the evidence claim by reiterating that, whenever "evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury cannot be permitted to return such a finding." *Karkaria*, *supra* at 1170 (citations omitted). Appellant argues that this principle is applicable herein.

We note that our High Court has previously found that challenges to a verdict pursuant to the *Farquharson* standard are properly to the weight, and not the sufficiency of, the evidence. *Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011). However, in a more recent decision, the Supreme Court elected to address a sufficiency claim through the lens of the *Farquharson* standard. *See Commonwealth v. Brown*, 52 A.2d 1139 (Pa. 2012). The *Brown* Court ultimately found, as we find now, that even if this standard is applicable to a sufficiency claim, an appellate court "will not, on sufficiency review, disturb the finder of fact's resolution except in those exceptional instances . . . where the evidence is so patently unreliable that

the jury was forced in engage in surmise and conjecture in arriving at a verdict based on that evidence." *Id*. at 1166.

Appellant maintains that, because the testimony of two of the Commonwealth's key witnesses was inconsistent and based on statements that they later recanted at trial, it was insufficient to support his convictions. However, our Supreme Court previously affirmed that prior inconsistent statements may be admitted as substantive evidence. *Brown*, *supra* at 1168. Contradictory evidence is deemed sufficient for a criminal conviction if it can be determined that "the finder of fact could hear the witnesses' explanations for making the out-of-court statements, and for their trial recantation," and the jury could reasonably credit the prior statements over the witness's later recantations. *Id*. This is the nature of the evidence in the case at bar.

It is beyond argument that credibility determinations are for the jury to resolve; hence, an appellate court may not reweigh the evidence and substitute its judgment for that of the finder of fact. *Commonwealth v. Gibson*, 720 A.2d 473 (Pa. 1998). Thus, as fact finder in the case at bar, the jury was free to believe all, part, or none of the initial statements given by Mr. Rogers and Mr. Gamble to police and admitted during trial, the witnesses' respective retractions, and Appellant's testimony denying his involvement in the shooting. *See Commonwealth v. Spotz*, 716 A.2d 580, 585 (Pa. 1998) (Holding that a jury is free to disbelieve evidence proffered

by Appellant that he was not the trigger person). Herein, the factfinder accepted the incriminating evidence in the witness statements and declined to believe the witnesses' retractions and Appellant's self-serving testimony.

Moreover, additional circumstantial evidence demonstrated that Appellant was one of the men involved in the murder. This evidence included: (1) the testimony of three additional witnesses that established that Appellant's niece and the victim's cousin had gotten into a fight at the bar that night; (2) Appellant's niece had requested that he come to Hill Creek and retaliate against Mr. Wright on her behalf, and later responded to Mr. Wright's assertion that Appellant retaliated against his younger cousin instead by stating "I'm sorry for your loss, but you're not going to threaten me," n.t., 11/20/13, at 53; (3) cell phone records which clearly showed that Appellant was near the crime scene immediately before and after the murder, and; (4) incriminating text messages between Appellant and other parties following the homicide. Mindful that the Commonwealth can establish any element of the offense beyond a reasonable doubt by wholly circumstantial evidence, and in light of the fact that the jury was cognizant of the circumstances surrounding the witnesses' statements to police and their motives for recanting those statements, we find that this case does not present an exceptional instance where the evidence is so patently unreliable that the jury was forced to engage in surmise or conjecture. Appellant's claim fails.

- 13 -

Having established Appellant as the assailant, we next address the *mens rea*. "In order to sustain a finding of first degree murder, the evidence must establish that a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with a specific intent to kill." **Commonwealth v. Mitchell**, 902 A.2d 430, 444 (Pa. 2006); 18 Pa.C.S. § 2502(a). An intentional killing is a "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). Both the specific intent and malice necessary to sustain a conviction for first-degree murder may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. **Commonwealth v. Smith**, 985 A.2d 886, 895 (Pa. 2009); **Commonwealth v. Houser**, 18 A.3d 1128, 1134 (Pa. 2011).

Instantly, police recovered multiple fired cartridges from the crime scene and several bullets were also recovered from the victim's body. N.T. 11/21/2013, at 36, 40, 78-81. The fatal bullet was extracted from the victim's brain, which is quite clearly a vital part of the victim's body. **Id**. at 81. The testimony and circumstantial evidence provided by multiple witnesses, including a witness to the shooting, was sufficient for the jury to conclude beyond a doubt that Appellant was guilty of first-degree murder.

Next, we address the conspiracy conviction. To sustain a conviction for conspiracy, the Commonwealth must prove that:

(1) The defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a "co-conspirator") to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an over act in furtherance of the agreed upon crime.

*Commonwealth v. Murphy*, 844 A.2d 1228, 1238 (Pa. 2004).

Most conspiracy cases lack direct evidence to illustrate the defendant's conspiratorial agreement. Therefore, the defendant's intent and the agreement are often proved through circumstantial evidence via the relations, conduct, or circumstances of parties. *See Commonwealth v. Ruiz*, 819 A.2d 92, 97 (Pa.Super. 2003) (Finding that the conduct and circumstances relating to the parties' conduct may satisfy the evidentiary requirement of linking the defendant to the alleged conspiracy beyond a reasonable doubt).

At trial, Ms. Tunstall testified that she called Appellant and asked him to confront Mr. Wright. N.T., 11/20/13, at 37-40. Mr. Gamble testified that he witnessed Ms. Tunstall say that she was going to "call her peoples" to come and physically harm Mr. Wright, and that shortly after, Appellant and his brother arrived at Mr. Gamble's house and asked him if he had seen Mr. Wright. *Id*. at 114. Mr. Gamble also testified that Appellant's brother subsequently showed him a gun that he was carrying and both stated that they were going to go look for Mr. Wright at the Grand Slam. *Id*.

Mr. Rogers also told police that he saw Appellant and a group of men surround an individual and that he heard Appellant yell, "your people

slapped my niece," right before he witnessed Appellant fire his gun at the victim. N.T., 11/21/13, at 200-201. The Commonwealth presented ample evidence from which the jury could find that Appellant and at least one other individual advanced a conspiracy to kill the victim. Accordingly, the certified record sustains the trial court's finding that the Commonwealth proved beyond a reasonable doubt the elements of criminal conspiracy.

The final sufficiency claim relates to the evidence supporting the firearms violation. Pennsylvania law defines carrying a firearm without a license as:

> Any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S. § 6106(1). "In order to sustain a conviction, the Commonwealth must prove that: (1) the weapon was a firearm; (2) the firearm was unlicensed; and (3) that the firearm was concealed on or about the person, outside his home or place of business." *Commonwealth v. Parker*, 847 A.2d 745, 750 (Pa.Super. 2004) (citations omitted).

Both parties stipulated at trial that Appellant did not have a license to carry a firearm. N.T., 11/21/13, at 160. Additionally, Mr. Rogers's established that Appellant possessed a gun, leveled it at the victim after encountering him on the public street, and shot him. *Id*. at 200-201.

Therefore, there was sufficient evidence for the jury to conclude that Appellant was guilty of carrying a firearm without a license.

Appellant's next issue challenges the weight of the evidence. The trial court's belief that the verdict is not against the weight of the evidence and that a new trial is not warranted in the interest of justice is one of the least assailable reasons for a trial court to deny a new trial. ***Commonwealth v. Widmer***, 744 A.2d 745, 753. (Pa. 2000). It is well-established that appellate review of a weight claim is limited to determining whether the trial court abused its discretion and is not to substitute an appellate court's judgment for that of the trial court. ***Commonwealth v. Best***, \_\_A.3d\_\_, 2015 WL 4366508 (Pa.Super. 2015). A new trial should only be awarded if the jury's verdict is so contrary to the evidence as to shock one's sense of justice. ***Thompson v. City of Philadelphia***, 493 A.2d 669, 672 (Pa. 1985).

Appellant once again invokes the rulings in ***Karkaria*** and ***Farquharson*** as the bases for his argument that the recantations of Mr. Rogers and Mr. Gamble established that the jury's verdict cannot stand. Appellant also states that the fact that Mr. Rogers's girlfriend, Ms. Nesmith, corroborated that he was asleep at the time of the shooting further indicates the unreliability of that witness's prior statements to the police. However, as we elucidated thoroughly *supra*, the law is clear that the jury was free to disregard the witnesses' recantations and accept the evidence presented by

the Commonwealth.  **See Brown**, **supra** at 1168 (contradictory evidence is sufficient for criminal conviction if it can be determined that factfinder heard witnesses' explanations for recantation at trial and reasonably credited prior statements).  Furthermore, the additional circumstantial evidence, such as the cell phone data, text message records, and testimony from the remaining witnesses, supported the trial court's determination that the jury's guilty verdict was not so contrary to the evidence as to shock one's sense of justice.  Appellant's claim fails.

Next, we address Appellant's contention that the trial court erred in refusing his requests for a mistrial after the Assistant District Attorney committed prosecutorial misconduct due to alleged improper statements that he made to the jury during his opening and closing arguments, and because the Commonwealth displayed a photograph of the victim's body during its summations.  For the reasons that follow, no relief is due.

As support for his assertions of prosecutorial misconduct, Appellant refers to four separate incidents where he alleges that the prosecutor made inflammatory or intemperate remarks.  A prosecutor may vigorously argue his case as long as his comments are either supported by the evidence, or contain reasonable inferences in light of this evidence.  **Commonwealth v. Eichinger**, 108 A.3d 821, 836 (Pa. 2014).  Not every intemperate or improper remark by the prosecution requires a new trial.  **Commonwealth v. Jarvis**, 394 A.2d 483 (Pa. 1978).  When a prosecutor uses intemperate

language or makes improper remarks a new trial is required only where the language's unavoidable effect is to prejudice the jury in such a way as to cause them to form a fixed bias or hostility against Appellant such that they could not weigh the evidence and render a true verdict. ***Commonwealth v. Begley***, 780 A.2d 605, 626 (Pa. 2001). Finally, the determination of whether a prosecutor's misconduct created prejudice in the minds of the jury falls within the trial court's authority and will not be reversed absent an abuse of discretion. ***Commonwealth v. D'Amato***, 526 A.2d 300, 310 (Pa. 1987).

In order to evaluate whether comments made by the prosecutor were improper, they must be examined in the context in which they were made. ***Commonwealth v. Hall***, 701 A.2d 190, 198 (Pa. 1997). As discussed *infra*, our review of Appellant's argument reveals that none of the statements, either alone or collectively, prejudiced the jury unavoidably or formed in their minds a fixed bias or hostility that would prevent them from properly weighing the evidence and rendering a true verdict. ***Commonwealth v. Weiss***, 776 A.2d 958, 970 (Pa. 2001).

Appellant accuses the prosecutor of "improperly vouching" for the decedent after he described the victim as "a pretty decent guy, a guy that didn't harm anybody," to the jury in his opening statement. N.T., 11/19/13, at 52. However, the prosecutor was simply using his opening argument to outline what he expected the evidence to show, *i.e.*, that the victim was

- 19 -

murdered as a consequence of his cousin's actions towards Appellant's niece and that he had just been trying to prevent his cousin from being hurt. Though the trial court overruled Appellant's objection to this remark, the judge also immediately reminded the jurors that the prosecutor's opening arguments did not constitute evidence and were simply his opinions on what he expected the evidence to illustrate. *Id*. at 53. An immediate curative instruction to the jury can alleviate the harmful effects of the improper admission of evidence and it is presumed that the jury will follow these instructions. ***Commonwealth v. Johnson***, 533 A.2d 994, 997 (Pa. 1987). Instantly, the prosecutor's comments were not prejudicial nor did they create a fixed bias which prevented the jury from rendering a true verdict. This challenge lacks merit.

Appellant also asserts that the prosecutor made inflammatory statements of his personal opinion during his closing arguments after he addressed the issue of the substantial period of time that the two witnesses, Mr. Rogers and Mr. Gamble, had been held in custody. Specifically, Appellant claims that the prosecutor gave his own personal testimony concerning his opinion of Appellant's guilt when he stated, in reference to Mr. Gamble's noncompliance with the subpoena, "I am unapologetic about putting Quinton Gamble in jail for five days if it's required to take a killer off the street." N.T., 11/22/13, at 247. However, the trial court found that this statement was simply being used as a reference to address the questions

Appellant raised about the length of time that the witnesses had been imprisoned. The prosecution's statement was made to clarify that Mr. Gamble was placed in custody as a result of his refusal to comply with a subpoena to testify. N.T., 11/20/13, at 107, 177-180. Nevertheless, the court once again provided the jury with strict instructions that arguments are not evidence in order to prevent the jury from giving them inappropriate consideration during their deliberation. As the jury is presumed to have followed these instructions, no relief is due. *Johnson*, *supra* at 997.

Next, Appellant contends that the assistant district attorney again proffered an improper statement of his personal opinion to the jury when he claimed that there were many reasons why witnesses might be uncooperative. Instantly, the prosecutor stated that, "They have to live in that neighborhood. They're in prison. Heck, they're getting confronted by a murderer." N.T., 11/22/23, at 252. Even if the prosecution's use of the word "murderer" was intemperate, Appellant fails to lend proper credence to the fact that the prosecutor immediately clarified the last sentence by rephrasing it as "one who is accused of murder." *Id*. Regardless, the trial court properly issued a curative instruction when he told the jury to disregard the prosecution's remark and it did not abuse its discretion by holding that this was sufficient to address any possibility of prejudice. *Id*. As jurors are presumed to have followed a trial court's curative instruction, we

find no basis to disturb the court's denial of the motion for mistrial on these grounds. **_Johnson_**, **_supra_**.

Appellant also incorrectly asserts that the above statement was improper because no evidence had been presented that he had threatened anyone. The Commonwealth highlights, however, that it presented evidence that Appellant confronted Mr. Gamble when they were accidentally placed in the same holding area and instructed, "you know what you gotta do." N.T., 11/20/13, at 179-180. This was a matter of record and it is not improper for a prosecutor to refer to a matter in evidence when asking the jury to make a credibility assessment of a recanting witness. **_Commonwealth v. Rios_**, 684 A.2d 1025, 1033-1034 (Pa. 1996). This assertion fails.

The next assertion of prosecutorial misconduct concerns a remark the prosecutor made during summation regarding another suspect in the case. During opening arguments, Appellant raised the issue as to why his brother, Jerome a/k/a "Fatty," had not been charged with the same crime when he had also been identified as being present at the scene of the murder on the night in question. Appellant now contends that the assistant district attorney committed prosecutorial misconduct by giving his own testimony on matters not in evidence after he said to the jury, "Ladies and gentlemen, you may ask why [F]atty isn't here. Where is Jerome? Well, if we get one more piece [of evidence], if we get one more piece . . . If we get one more piece--." N.T., 11/22/13, at 262.

- 22 -

A prosecutor may properly respond to all defense arguments. ***Commonwealth v. Brown***, 711 A.2d 444, 454 (Pa. 1998). The trial judge correctly found that Appellant had opened himself up to this rebuttal when he referred to the fact that Jerome had not been charged, essentially asking the jury to draw inferences from this fact. The Commonwealth did not commit misconduct by addressing Appellant's inference.

Appellant next claims that a photograph of the victim that he described as clearly illustrating the bullet wounds in the victim's body improperly was allowed to remain projected on the large screen in front of the jury during the Commonwealth's closing arguments. Appellant argues that the prosecutor intended to inflame the jury. In passing upon this assertion, the trial court concluded that this issue was waived because Appellant failed to either identify the photograph or explain why he specifically believed that the unidentified photograph was improper and inflammatory. We concur with the trial court's finding that the issue is waived.

Appellant's only description of the ostensibly prejudicial exhibit is, "a photograph of the decedent showing bullet holes." Appellant's brief at 56. Beyond that, there is little else in Appellant's brief, concise statement of errors, or the certified record, with which we can deduce which photograph is the basis of Appellant's claim. Our independent review of the certified

record did not reveal a photograph that fit Appellant's description or illustrated the victim's bullet-riddled body.

One exhibit, a black and white photograph marked C-17, depicts the upper part of the decedent's body in an uncovered state; however, contrary to Appellant's description, there are no bullet holes visible on the body. Similarly, there is no evidence in the photograph of spent shells or markings on the street to indicate the level of violence associated with the murder. Moreover, the Commonwealth used a computer program to sanitize Exhibit C-17 before introducing it into evidence. The program dulled the presence of any blood and redacted all of the victim's facial features as well as any evidence of a gunshot wound to his head. All that remained was the benign contour of the victim's facial profile. Thus, even assuming, *arguendo*, that the photograph in question was C-17, there is nothing in it which could be considered "inflammatory." As Appellant failed to identify the photograph upon which his claim is predicated and our independent review of the notes of testimony and trial exhibits did not reveal a photograph that either fit Appellant's description or was so viscerally graphic that it inflamed the minds and passions of the jury, we cannot address the merits of this claim.

Appellant's final argument is that the trial court abused its discretion when it permitted Mr. Roger's prior written statements and transcripts of Appellant's text messages, to go back with the jury during deliberation. Appellant argues that this evidence only favored the prosecution, and

thereby tainted the jury's verdict. The pertinent law permits liberal review of exhibits during deliberations. "Upon retiring, the jury may take with it such exhibits as the trial judge deems proper. . . [but that] [d]uring deliberations, the jury shall not be permitted to have: (1) a transcript of any trial testimony; (2) a copy of any written or otherwise recorded confession by the defendant; (3) a copy of the information or indictment; [or] (4) . . . written jury instructions." Pa.R.Crim.P. 646.[1] "Whether an exhibit should be allowed to go out with the jury during its deliberation is within the sound discretion of the trial judge." *Commonwealth v. Barnett*, 50 A.3d 176 (Pa.Super. 2012).

Before we begin our analysis, it should be noted that the jury specifically requested that the exhibits in question, along with the prior statements taken from Ms. Koba and Mr. Gamble, be sent back during their deliberation. Appellant objected to this request but was overruled by the trial court. N.T., 11/25/13, at 77-78. Appellant now contends that Mr. Rogers's statements fall under the rule's preclusion of "a transcript of any trial testimony," and that, in any event, this was an abuse of discretion because none of the evidence which refuted these statements was sent back, despite the fact that the jury had never requested these other

---

[1] On July 7, 2015, the comment to Rule 646 was revised, effective October 1, 2015. The revisions are not relevant to our review.

exhibits. *Id*. at 78-79. However, the trial court correctly noted that Appellant had sufficient opportunity during cross-examination to focus the jury's attention on Mr. Rogers's retraction and that it was unnecessary for it to have this contradicting testimony in hand when it had not requested the information in the first place. Trial Court Opinion, 06/23/14, at 20-21. Similarly, the mere fact that these statements were read into the record during witness examinations, and after they had already been approved as evidentiary exhibits, does not grant them the precluded status of "trial testimony." ***Commonwealth v. Parker***, 104 A.3d 17 (Pa. Super. 2014) (Holding that the trial court did not abuse its discretion by permitting a witness's prior inconsistent statement to be sent back with jury during its deliberation).

Appellant makes a similar argument in regards to the record of his text messages, which were allowed to be sent back to the jury upon its request. Although he does not claim that these particular statements fall into any of the precluded categories in Rule 646, Appellant instead argues that this was unfair because the jury was not also given, *sua sponte*, his own testimony regarding his alleged meaning of the coded language in the texts as referring to his illegal drug business and not the victim's murder. Appellant's legal argument conveniently ignores Rule 646's express preclusion of any trial testimony, including his own. Moreover, Appellant fails to address how the transcript of his explanation would assist the jury in

- 26 -

light of the fact that he had multiple opportunities during trial to decode the meaning of the text messages for the jury. Accordingly, we find that the trial court was well within its discretion, pursuant to Rule 646, to send to the jury the properly-admitted evidence which it had requested while also declining to send back trial testimony and other exhibits which it had not requested. Appellant's claim fails.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/25/2015