J-S13020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF S.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.S | No. 832 WDA 2015 |

Appeal from the Dispositional Order Dated April 22, 2015
In the Court of Common Pleas of Allegheny County
Juvenile Division at No: CP-02-JV-0001954-2014; JID No. 92387-A;
Case No. T-180189; and Docket Number 1639-14

BEFORE:  LAZARUS, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.: **FILED APRIL 13, 2016**

Appellant S.S. appeals from the April 22, 2015, dispositional order of the Court of Common Pleas of Allegheny County ("juvenile court"),[1] which adjudicated him delinquent of two counts of rape under Section 3121(c) of the Crimes Code (Code), 18 Pa.C.S. § 3121(c), for sexually abusing his then eight to nine year old female cousin, A.S.H. ("victim").  Upon review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant misses that "the appealable order is not the adjudication of delinquency (the equivalent of a finding of guilt in criminal matters), but rather is the dispositional order (the equivalent of the judgment of sentence in criminal matters)." **In re J.D.**, 798 A.2d 210, 211 n.1 (Pa. Super. 2002). We have corrected the caption accordingly.

Appellant was adjudicated delinquent of the foregoing offenses based on the following uncontradicted facts, as summarized by the juvenile court:

> Since the time of her birth until she was about nine years old, [victim] resided primarily with her mother, K.S. [Victim] would regularly spend the weekends with her father, E.H. In June of 2014, the victim's paternal grandmother was residing with the victim's father. The same month, the victim's paternal grandmother, J.W.K., received a phone call from her mother, the victim's great-grandmother. The great-grandmother was calling J.W.K. to tell her of an incident between the victim . . . and the victim's younger, then four-year-old cousin L. Counsin L. told great-grandmother that [the victim] had placed a crayon in counsin L's rectum. Forensic Specialist Jennifer Ginsburg would later characterize this behavior as "sexually acting out." [The victim] had allegedly threatened cousin L. not to tell or else she was going to "F [cousin L.] up. Shortly thereafter, when [the victim] was in custody of her father's side of the family, J.W.K. decided to privately confront [the victim] without [the victim's] father being present. She asked [the victim] about what happened with cousin L., and [the victim] immediately confessed to the crayon incident. J.W.K. described [the victim's] disposition as ashamed with her head down. J.W.K. then asked why she did something like this; [the victim] replied that someone did it to her first. When J.W.K. asked her what specifically, she said that she and her cousin [Appellant] "had been touching." Again, she asked what happened, and [the victim] said, [Appellant] put his thing in her butt." [The victim] also told paternal grandmother that she had previously told both her mother and maternal grandmother.
>
> J.W.K. then privately relayed the conversation to her son E.H., [the victim's father. E.H. asked [the victim] "what happened." Then E.H. asked "did something happen?" E.H. said that was when [the victim] just "shut down," but not before telling [E.H.] that [Appellant] had "laid on top of her and pulled his pants down." Around the same time, J.W.K. called A.W., the father's then-girlfriend (now fiancée), and told her to come over to the house. When A.W. arrived, J.W.K. "kind of told A.W. what was going on." A.W. arrived when the victim was speaking alone with her father[, E.H.].
>
> After their talk, her father and A.W. then took [the victim] to the police station. A.W. testified that the first police station they went to was in the wrong zone, which is irrelevant except to set the scene where, upon arriving at the second police station, [E.H.] went into the building first to make sure they were in the right place. At this point, [the victim] and A.W. were alone; prior to this moment, the two had not spoken. A.W. testified that the [victim] "looked traumatized."

A.W. asked [the victim] what happened, assuring her that she did not want to hurt [the victim], but rather wanted to protect her. [The victim] told A.W.: "[Appellant] put his stuff in my butt." A.W. asked what she meant by "stuff." The [victim] replied that she meant his "private part." A.W. asked who else [the victim] told; [the victim] said she told her mother, her maternal grandmother and her aunt C.S. ([Appellant's] mother). When A.W. asked the [victim] what the adults said after she told them what happened, [the victim] said that they assured her it would not happened again. A.W. testified that she assured her it would stop and "let it alone," because she did not want to keep questioning [the victim]."

The police directed the victim's father and A.W. to take the [victim] to the Emergency Room at Children's Hospital, where [the victim] was examined by Dr. Raymond Pitetti. Dr. Pitetti testified that he speaks with his patients about what occurred to necessitate the trip to the hospital. This way, he knows what to look for in his physical examination. He was also briefed on the situation by the family prior to talking with [the victim]. Dr. Pitetti did not remember exactly who was in the room during the examination, but he testified that he thought it was at least one other doctor, A.W., and J.W.K. The defense asked Dr. Pitetti whether he led the [victim] when he questioned her. Dr. Pitetti testified:

"I don't remember my exact words to her, but typically, I would not ask in that fashion. I would try not to put a thought in mind or words in her mind. So, I would try to ask her, can you tell me what happened. So, I would try not to use the words that the stepmom or the grandmother might have used."

When Dr. Pitetti asked [the victim] for himself what happened, the [victim] testified that [Appellant] "put his stuff in my butt." Dr. Pitetti testified that he did not recall the [victim's] demeanor or how she was acting. Dr. Pitetti testified that the result of the examination showed no signs of force, bleeding, bruising or trauma. He elaborated that that would not rule out sexual abuse, because physical manifestations depend on the size of the people and the force involved. Dr. Pitetti testified that there was "a time" between the sexual abuse and the medical examination. Dr. Pitetti testified that the [victim] denied anal bleeding or trouble with her bowels or urination. The hospital involved its social worker; a Child Line was filed.

Later that week, [the victim] met with Jennifer Ginsburg, a forensic specialist at the Child Advocacy Center. Jennifer Ginsburg testified that when she interviewed the [victim, the victim] appeared a little quiet and nervous but coherent. Notably, Jennifer Ginsburg testified that her discussion with [the victim] was a "non-leading" interview, meaning that she "wouldn't ask anything directly unless [the victim] brings it up." Jennifer Ginsburg asked the [victim] why her father and A.W.

brought her to the Child Advocacy Center to meet with her. [The victim] told Jennifer Ginsburg that it was "because of something [Appellant] did." Jennifer Ginsburg then asked what [Appellant] did, to which [the victim] replied: "stuck his stuff in my butt." Jennifer Ginsburg testified that the [victim] further indicated that the incident happened more than once and at home of her maternal grandmother. At that point she "shut down," by putting her head on the table, covering her face with her arm, and whispering her answers. Prior to that moment, however, Jennifer Ginsburg testified that [the victim] was spontaneous with her answers. [The victim] became more hesitant, but she still described the incidents. Jennifer Ginsburg still characterized her as "alert."

Jennifer Ginsburg testified that [the victim] said that [Appellant] laid on top of her. [The victim] told Jennifer Ginsburg that one of the times she could see [Appellant's] hands. The [victim] did not specify to Jennifer Ginsburg the number of times she was abused, but did say, that the first time was when she was in first grade and the last time was when she was in second. Jennifer Ginsburg said that [the victim] did not know whether to describe [Appellant's] "stuff" as soft or hard or something else. She did not use the word "penis," but Jennifer Ginsburg said that [the victim] said that his "stuff" "was used to stick inside people." Jennifer Ginsburg testified that when she conducts such interviews, one of the things that will give her an "alert" is when a [victim] uses a term that is mature for her age. She testified that that did not really happen here, that [the victim's] terminology was age appropriate.

At trial, [the victim] took the stand. She was asked on direct examination why she thought she was here. Similar to her interview with Jennifer Ginsburg, she testified that she thought she was here "because of [Appellant]. When asked why "because of [Appellant], [the victim] testified "because he put his private part in my butt." She testified that this took place in her maternal grandmother's home. She stated that [Appellant] did this four times. In one instance, the [victim] was on the couch when [Appellant] pushed her on her stomach and put "his private part in my butt." The [victim] said that she had been clothed, but that she felt [Appellant's] "private part." She said that it hurt and that she was scared. When asked how she knew it was his penis that went into her anus, she testified that she felt it; while she could see his hands. In another instance, the [victim] testified that she was watching TV in her maternal grandmother's room when [Appellant] came into the room, pushed her down and "put his private part in my butt." The incident stopped when [the victim's] mother arrived at the home, and [Appellant] left the room.

For her part, K.S., the victim's mother, testified that [the victim] had told her that [Appellant] had "touched" her two or three years prior to the police's involvement. K.S. did not tell anyone or do anything other than tell [the victim] not be alone

with [Appellant] anymore. Her mother did not prevent the victim from being in her maternal grandmother's home, where the victim was often babysat and where [Appellant] was often present. K.S. said her daughter described this "touching" as what appeared to be grinding motion, where [Appellant] moved [the victim] back and forth while she sat on his lap. After K.S. told the victim not to be alone with [Appellant], there was another incident where the two were together. [K.S.] went to maternal grandmother's house to pick up [the victim] and take her to a dentist appointment. When K.S. arrived, she called out but evidently no one was home. When she began to walk up the stairs, she saw [Appellant] walk out of the bedroom. She asked where [the victim] was and [Appellant] pointed to the bedroom from which he had just left. When she asked [the victim] why she was alone in the room with [Appellant], a violation of her rule, the [victim] said, "he touched my butt." After that incident, she testified that she did not let [the victim] go back to her maternal grandmother's house without her.

Mother testified that she was not sure her daughter told her that [Appellant] anally penetrated her. Mother testified that [the victim] said that [Appellant] was on top and moved back and forth. She also testified that she did not know whether all of [the victim's] clothes were off.

Trial Court Opinion, 9/14/15, at 1-7 (record citations omitted).

On appeal, Appellant raises a single issue for our review:

Did the hearsay statement made by a child victim to family members, a caseworker, and a doctor have sufficient indicia of reliability to be properly admitted?

Appellant's Brief at 5. In essence, Appellant argues that the trial court abused its discretion in admitting the victim's statement to family members, Dr. Pitetti, and Jennifer Ginsburg under the Tender Years Exception to the hearsay rule. *Id.* at 17-24. In support of his argument, Appellant points out that the victim's statement that Appellant put his private part in her rectum lacked sufficient indicia of reliability. *Id.* at 17.

Our standard of review of dispositional orders is well-settled: "The Juvenile Act grants broad discretion to the court when determining an

appropriate disposition. We will not disturb a disposition absent a manifest abuse of discretion." *In the Interest of R.D.*, 44 A.3d 657, 664 (Pa. Super. 2012), *appeal denied*, 56 A.3d 398 (Pa. 2012) (quoting *In the Interest of R.D.R.*, 876 A.2d 1009, 1013 (Pa. Super. 2005)). An abuse of discretion "requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Commonwealth v. Rodriguez*, 81 A.3d 103, 106 (Pa. Super. 2013) (quotation omitted), *appeal denied*, 91 A.3d 1238 (Pa. 2014).

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). "The Tender Years Exception allows for the admission of a child's out-of-court statement due the fragile nature of young victims of sexual abuse." *Commonwealth v. Kriner*, 915 A.2d 653, 657 (Pa. Super. 2007) (citation omitted). The Tender Years Exception to the hearsay rule provides in relevant part:

> **§ 5985.1. Admissibility of certain statements**
>
> **(a) General rule.--**An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25 (relating to criminal homicide), 27 (relating to assault), 29 (relating to kidnapping), 31 (relating to sexual offenses), 35 (relating to burglary and other criminal intrusion) and 37 (relating to robbery), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:
>
> > (1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
> >
> > (2) the child either:

> > (i) testifies at the proceeding; or
>
> > (ii) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(a). Any statement admitted under the Tender Years Statute "must possess sufficient indicia of reliability, as determined from the time, content, and circumstances of its making." *Commonwealth v. O'Drain*, 829 A.2d 316, 320 (Pa. Super. 2003) (citation omitted); *accord Commonwealth v. Lyons*, 833 A.2d 245, 254 (Pa. Super. 2003). "The main consideration for determining when hearsay statements made by a child witness are sufficiently reliable is whether the child declarant was particularly likely to be telling the truth when the statement was made." *Lyons*, 833 A.2d at 255 (citation omitted), *appeal denied*, 879 A.2d 782 (Pa. 2005). Factors a court may consider when determining the reliability "include the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age and the lack of a motive to fabricate." *Commonwealth v. Delbridge*, 855 A.2d 27, 47 (Pa. 2003); *see Lyons*, *supra*.

Instantly, Appellant argues simply that the victim's statement to her family members, Dr. Pitetti and Jennifer Ginsburg that Appellant "put his penis in her rectum" lacked sufficient indicia of reliability because the victim

had a reason to fabricate the abuse committed by Appellant.[2,3]  Appellant's

Brief at 17.  Specifically, Appellant claims:

> [The victim] had significant motivations to fabricate and blame other person for assaulting her since she was being accused of assaulting a child.  Multiple members of her family focused on her and her actions of anally penetrating her younger cousin with a crayon.  By blaming [Appellant] of anally penetrating her, [the victim] deflected the focus from her assaultive behavior.  Rather, the focus became her status as a victim.
>
> . . . .
>
> Understandably, her family immediately tried to protect her and assist her, rather than focusing negative attention on her or reprimanding her for victimizing her cousin.

Appellant's Brief at 18-19.

Based on our review of the record, as set forth above, we must

disagree.  The trial court did not abuse its discretion in allowing the victim's

out-of-court statement made to family members, Dr. Pitetti and Jennifer

Ginsburg under the Tender Years Exception to the hearsay rule, because it

possessed sufficient indicia of reliability.  As the trial court noted, the

victim's statement that Appellant put his private part in her rectum was not

---

[2] As the Commonwealth points out and Appellant's Brief confirms, Appellant does not allege that the victim's statements lacked spontaneity, were not consistent in their repetition, or did not consist of terms unexpected in children of that age.  Appellant's Brief at 21, 24.  Moreover, Appellant does not challenge the victim's mental state.  *Id.* at 21.

[3] Insofar as Appellant relies on *Commonwealth v. Barnett*, 50 A.3d 176 (Pa. Super. 2013), *appeal denied*, 63 A.3d 772 (Pa. 2013), we reject such reliance as inapposite.  This case compels an outcome similar to the one reached in *Barnett*, where we concluded that the trial court did not abuse its discretion in allowing certain out-of-court statements under the Tender Years Exception.  *Barnett*, 50 A.3d at 188.

fabricated and she did not utter it to get herself out of trouble. Trial Court Opinion, 9/14/15, at 15. Moreover, we agree with the trail court that Appellant's challenge to the fabrication factor does not outweigh or undermine the ample indicia of reliability created in this case, particularly through the spontaneity of the victim's statements and their consistent repetition in various settings. *Id.* at 16-17. Thus, like the trial court, we observe that Appellant's appeal appears to be anchored in a "vague common belief that sometimes kids lie to get out of a reprimand." *Id.* at 16.

Dispositional order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/13/2016